**Konrad L. Trope** (California SBN: 133214)
TROPE AND TROPE LAW GROUP
9777 Wilshire Blvd., Suite 400
Beverly Hills, California 90212
Phone: (818) 575-7423
Email: ktrope@tropeandtropelawgroup.com

Attorneys for Plaintiff, Trident Concert Productions, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| Trident Concert Productions, LLC, a Nevada Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> Ticketmaster, LLC, a Virginia Limited liability company; Live Nation Entertainment, Inc, a Delaware Corporation; ASM Global Theater Management, LLC, a Delaware Limited Liability Company; City of Los Angeles; Karen Bass, Mayor of the City of Los Angeles; City of Los Angeles Department of Recreation and Parks; Renata Simril, Commissioner of the Los Angeles Department of Recreation and Parks; Luis Sanchez, Commissioner of the Los Angeles Department of Recreation and Parks; Marie Lloyd, Commissioner of the Los Angeles Department of Recreation and Parks; Fiona Hutton, Commissioner of the Los Angeles Department of Recreation and Parks; Benny Tran, Commissioner of the Los Angeles Department of Recreation | Case No: _____ <br><br> **COMPLAINT FOR:** <br> (1) Breach of Written Contract; <br> (2) Breach Of the Covenant Of Good Faith And Fair Dealing; <br> (3) Fraud in the Inducement; <br> (4) Fraudulent Misrepresentation; <br> (5) Fraudulent Concealment; <br> (6) Violations Of the Racketeering Influence and Corrupt Organizations Act (RICO) (18 U.S.C§§1961-1964); <br> (7) Violation of the Unruh Civil Rights Act (Cal. Civ. Code §51); <br> (8) Unlawful Exclusive Dealing In Violation of Sherman Act § 1; <br> (9) Monopolization Of Primary Ticketing Services Markets In Violation of Sherman Act § 2; <br> (10) Unlawful Exclusive Dealing in Violation of Sherman Act, § 1; |

and Parks; Kristin Sten General Manager of The Greek Theater, Owned and Operated by the Los Angeles Department of Recreation and Parks; and DOES 1 through 10, inclusive,

Defendants.

(11) Monopolization of Markets for Concert Promotion Services in Violation of Sherman Act § 2

**JURY DEMAND**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................. 5

    A.  MISHANDLING OF PALASADE'S FIRE ............................ 5

    B.  MISSPENDING TAXPAYERS' FUNDS ALLOCATED
        FOR  HOUSING THE HOMELESS ........................................ 6

    C.  MISHANDLING AND REFUSAL TO SPEND $1 BILLION
        UNDER COURT ORDER TO MAKE CITY PARKS
        ACCESSIBLE TO HANDICAPPED CITIZENS ..................... 6

    D.  CITY LEADERSHIP OVERSEEING CORRUPT
        ADMINISTRATION OF THE GREEK THEATER ................ 7

    E.  THE PARTIES ...................................................................... 9

    F.  JURISDICTION AND VENUE .............................................. 10

    G.  ILLEGAL MONOPOLY POWER OF DEFENDANTS
        TICKETMASTER AND LIVE NATION ............................... 11

    H.  Industry Background ............................................................ 18

II.  Live Nation Maintains Monopolies and Market Power across the Live
    Concert Ecosystem Through an Anticompetitive and Exclusionary
    course of Conduct ...................................................................... 36

III.  ANTICOMPETITIVE EFFECTS AND COMPETITIVE HARM .... 48

IV.  RELEVANT MARKETS AND MONOPOLY POWER ................. 52

V.  PRIMARY TICKETING SERVICES MARKETS ........................... 54

VI.  CONCERT VENUES ................................................................... 63

VII.  PROMOTION SERVICES TO ARTISTS ....................................... 66

VIII.  ARTIST USE OF LARGE AMPHITHEATERS ............................ 68

THE GREEK THEATER ......................................................................... 70

IX.  PLAINTIFF'S FRUSTERATED ATTEMPT TO PRODUCE SHOWS
    WITH THE GREEK THEATER WITHOUT INVOLVEMENT OF
    THE DEFENDANTS TICKETMASTER AND LIVE NATION ...... 72

TRIDENT  COMPLAINT

FIRST CLAIM FOR RELIEF ........................................................................... 84

SECOND CLAIM FOR RELIEF ..................................................................... 85

THIRD CLAIM FOR RELIEF ......................................................................... 86

FOURTH CLAIM FOR RELIEF ........................................................ 88

FIFTH CLAIM FOR RELIEF ......................................................................... 90

SIXTH CLAIM FOR RELIEF ......................................................................... 91

The RICO Enterprise........................................................................ 92

EIGHTH CLAIM FOR RELIEF ............................................................................ 99

NINTH CLAIM FOR RELIEF......................................................................... 100

TENTH CLAIM FOR RELIEF ........................................................................ 102

ELEVENTH CLAIM FOR RELIEF ............................................... 104

PRAYER........................................................................................................ 106

DEMAND FOR JURY TRIAL ....................................................................... 110

**COMES NOW**, Plaintiff Trident Concert Productions, presenting its complaint for various claims for relief as follows:

## I.      INTRODUCTION

1.      This lawsuit is about a breach of public trust between the City of Los Angeles and its Senior Citizens. This lawsuit is also about the corrupt process by which illegal contractual arrangements involving private companies doing business with The Greek Theater, a concert venue that is owned by the City of Los Angeles. The Greek Theater is an asset of the City that should be handled with great care especially when it comes with providing access to Senior Citizens who seek to attend concerts at The Greek Theater. At the center of this controversy is once again Karen Bass, the Mayor of the City of Los Angeles. Mayor Bass is no stranger to mishandling the public's trust in her scandal-plagued administration.

### A.      MISHANDLING OF PALASADE'S FIRE

2.      First, was the mishandling by Mayor Bass and those officials underneath her, concerning the utter failure to prepare for much less contain the January 2025 Palisades fire which destroyed over 5,400 homes. To date, there has been no explanation for why the 117-million-gallon Santa Ynez Reservoir, just north of Pacific Palisades, was totally empty of water which certainly would have significantly helped in fighting the fire and mitigating the damages to 5,400 homes.

3.      Nor has Mayor Bass provided an explanation to why the budget for the Los Angeles Fire Department was cut by 20% despite warnings that the Fire Department was already understaffed and underequipped. Nor has there been an explanation as to why Mayor Bass was in Ghana while the Palisades burned to the ground. Prior to her departure to Ghana, Mayor Bass had been given repeated warnings that sever Santa Ana winds were imminent, which of course fanned the flames that destroyed a large portion of the City of Los Angeles.

**B. MISSPENDING TAXPAYERS' FUNDS ALLOCATED FOR HOUSING THE HOMELESS**

4.     Mayor Bass, along with other city officials,  has been locked in a Federal Court case in which the City of Los Angeles, and the County of Los Angeles have been named as Defendants for the *mishandling of billions of dollars* that were earmarked for building housing for thousands of homeless citizens. *See LA Alliance for Human Rights v. City of Los Angeles, et. al.,* 2:20-cv-02291 (C.D. Cal.).

5.     Indeed, on more than one occasion, the Federal Judge presiding over this case has criticized Mayor Bass and various City officials for their inability to account for how billions of  taxpayer funds were spent for housing the homeless.  A March 2025 audit found that the City and County of Los Angeles could not properly account for how billions of dollars meant to combat homelessness were spent.

6.     This case dragging on since 2020, costing the taxpayers of the City of Los Angeles additional millions of dollars in legal fees because Mayor Bass and other City officials repeatedly delay compliance with the 2022 settlement reached with the LA Alliance in which the City agreed to create thousands of new shelter beds for the homeless.  Indeed, millions of taxpayer funds were recently authorized to cover recent legal fees expended so that Mayor Bass and other City officials could avoid testifying in the case.

**C. MISHANDLING AND REFUSAL TO SPEND $1 BILLION UNDER COURT ORDER TO MAKE CITY PARKS ACCESSIBLE TO HANDICAPPED CITIZENS**

6.     The City and Mayor Bass, not only have a history of misspending and failing to account for billions of taxpayer dollars for addressing homelessness, as described above, but the City and Mayor Bass are violating a 2016 Federal Court Settlement and Court Order to spend over $1 Billion to fix the City's parks and

park facilities so that they are accessible to all people, including those with physical handicaps, in compliance with the Federal statute known as the American's with Disabilities Act ("ADA").

7.      Instead, the City and Mayor Bass have refused to comply with the 2016 Settlement/Court Order whereby $1 Billion in taxpayer money was to be earmarked for repairs of "pervasive and hazardous" physical barriers in the City's parks and park facilities.  The City is refusing its 2016 Court ordered obligations to repair and dangerous park conditions such as:

> a. inaccessible or non-existent entrance ramps;
>
> b. cracked and crumbled paths;
>
> c. non-functioning/non-compliant public restrooms; and
>
> d. inaccessible picnic areas, athletic fields and playgrounds

8.      Now, the City, under Mayor Bass's deficient leadership, face a class action lawsuit in Federal Court in Los Angeles, that is set to go to trial regarding the City's failure to abide by Federal laws meant to provide access to everyone, regardless of their physical challenges. Thus, millions in legal fees and costs will be spent instead of Mayor Bass just following the law and complying with the 2016 Federal Court Settlement.  See *Griffin, et. al. v. City of Los Angeles*,  U.S. District Court, Central District of California, Case No. 2:24-cv-06312.

## D.    CITY LEADERSHIP OVERSEEING CORRUPT ADMINISTRATION OF THE GREEK THEATER

9.      In addition to scandals over:

> a. the mishandling handling of the Palisades Fire including insufficient firefighting equipment and an unexplained water shortage;
>
> b. the mishandling and misspending of hundreds of millions of dollars for homeless housing, and

c.  the blatant refusal to comply with a 2016 Federal Court Settlement calling for $1 Billion to be spent on park and park facilities repairs so that handicapped citizens can access the City's parks;

10.    Now, the City, in particular the Department of Recreation and Parks, under the supervision of Mayor Bass, has engaged in an illegal financial arrangement with Ticketmaster and Live Nation for the unwritten exclusive operation of The Greek Theater, a City owned facility. Under policies and protocols imposed by Ticketmaster, Senior citizens of the City who don't use "smart phone" apps are denied access to Greek Theater concerts.

11.    The City, the Department of Recreation and Parks, and Mayor Bass allow this discrimination against Senior Citizens to continue unabated and unsupervised, because City officials under Mayor Bass have quietly agreed to an illegal financial arrangement with Defendant Ticketmaster and Defendant Live Nation for the indirect management of The Greek Theater.

12.    This illegal arrangement which violates Federal anti-trust laws, generates money for the City at the expense of Senior Citizens who can't access "smart phones" in order to purchase tickets. Thus, concert producers and live events at The Greek Theater that appeal to Senior Citizens are discouraged or suffer financial ruin if they are not contracted with Ticket Master and Live Nation for ticketing and concert promotion. Thus, Ticketmaster and Live Nation illegally, secretly, and indirectly operate and manage The Greek Theater, a City owned facility.

13.    Apparently, Mayor Bass, the five commissioners of the Department of Recreation and Parks, along with Defendant  don't care if the rights of Senior Citizens to access public facilities under the California Unruh Act are ignored and violated. Just as with the other scandals under Mayor Bass, who knows where or how the City's revenue from its park facilities are allocated and spent.

14.    The Greek Theater is a public venue owned by the City of Los Angeles ("the City"), unlike the vast majority of performance art venues in the City. That

means that there should be transparency in how various entertainment acts are booked through The Greek Theater. It is very easy to find news articles about the corruption over the past 50 years that has surrounded the management contract and booking of entertainment acts at The Greek Theater. See Exhibit "1".

15.    Furthermore, there should be complete transparency concerning how tickets are sold to The Greek Theater events, including insuring that Senior Citizens, who are not technologically savvy with "smart phones" and "apps", are not subjected to the unreasonable technical protocols mandated by Defendant Ticketmaster and its parent company, Defendant Live Nation. The technical protocols or procedures frustrate Senior Citizens attempting to purchase tickets, and thus ultimately prevent a significant portion of Senior Citizens from enjoying the public venue known as The Greek Theater.

16.    This Greek Theater scandal constitutes the fourth major mess under the Bass administration. Only this time, the City Council isn't involved, but instead the five (5) Commissioners, all appointed by Mayor Bass, who oversee the Department of Recreation and Parks, have either actively or passively participated in this corruption concerning access by Senior Citizens to The Greek Theater, a publicly owned venue, that is subject to state public access statues as more fully described herein below.

**E.    THE PARTIES**

17.    Plaintiff Trident Concert Productions, LLC, a Nevada Limited Liability Company.

18.    Defendant Live Nation is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, CA 90210. Defendant Ticketmaster is a Virginia limited liability company with its principal place of business at 9348 Civic Center Drive, Beverly Hills, CA 90210.

19.    Defendant City of Los Angeles ("the City") is a municipal corporation under the law of the State of California.

TRIDENT  COMPLAINT

20. Defendant Karen Bass is the Mayor of the City of Los Angeles ("Mayor Bass").

21. Defendant City of Los Angeles Department of Recreation and Parks ("DRP") is charged with overseeing the management and operations of all City Park facilities.

22. Defendant Renata Simril ("Commissioner Simril"), is a Commissioner of the Los Angeles Department of Recreation and Parks.

23. Defendant Luis Sanchez ("Commissioner Sanchez"), is a Commissioner of the Los Angeles Department of Recreation and Parks.

24. Defendant Marie Lloyd ("Commissioner Lloyd"), is a Commissioner of the Los Angeles Department of Recreation and Parks.

25. Defendant Fiona Hutton ("Commissioner Hutton"), is a Commissioner of the Los Angeles Department of Recreation and Parks.

26. Defendant Benny Tran ("Commissioner Tran"), is a Commissioner of the Los Angeles Department of Recreation and Parks.

27. Defendant ASM Global Theater Management, LLC, a Delaware Limited Liability Company ("ASM") is the management company which operates The Greek Theater under a contract with the City that was executed in 2018.

28. Defendant Kristin Sten, is the General Manager ("Sten") of The Greek Theater.

## F.  JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action under 18 U.S.C. §§ 1961-1964 of the RICO Act, Section 4 of the Sherman Act, 15 U.S.C. § 4, Sections 4c, and 28 U.S.C. §§ 1331, 1337(a), and 1345(d), and has supplemental jurisdiction under 28 U.S.C. § 1367(a).

30. The Court also has personal jurisdiction over the Defendants, and therefore venue is proper in this District under U.S.C. §§ 1961-1964 of the RICO Act, and under 28 U.S.C. § 1391, because all Defendants transact business in or are found within this Judicial District.

31.     Each Defendant engages in, and its activities substantially affect, interstate trade and commerce. Each Defendant provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally. Defendants' actions and course of conduct are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

32.     The true names and capacities of the Defendant's named in this complaint as Does 1 through 10, inclusive, were individual, cooperate, associate or otherwise, presently unknown to Plaintiff and therefore sue these Defendant's by such fictitious names. Plaintiff will amend this complain to set forth true names and capacities of Does 1 through 10, inclusive, when they have been ascertained or at the time of trial herein. Plaintiff is informed, believes and thereon allege that each of these fictitiously named Defendants participated in some manner in the events or occurrences referred to hereinafter and were also proximate cause of damages to Plaintiff herein.

33.     Plaintiff is informed, believes and thereon allege that, at all times herein mentioned, that each of the Defendant's including the fictitiously named Defendant was the agent, servant, employer, coconspirator of each of the other Defendant's, and doing things herein alleged, was acting in the scope of his, her, or its actual, apparent or special authority as such agent, servant, employer, coconspirator with permission or consent of each co-Defendant.

## G.     ILLEGAL MONOPOLY POWER OF DEFENDANTS TICKETMASTER AND LIVE NATION

34.     One monopolist serves as the gatekeeper for the delivery of nearly all live music in America today: Live Nation, including its wholly owned subsidiary Ticketmaster. In Live Nation's words, it is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company." Indeed,

Live Nation is all these things, to the detriment of fans, artists, venues, and competition.

35.    Today, musical artists must rely on promoters, venues, and ticketers to organize the business of playing live music. These service providers should work to serve the interests of artists and fans. Genuine competition for and among these service providers would generate the best, most cost-effective, and fan-friendly experience. But the world live music fans live in today is far from that.

36.    Live Nation directly manages more than 400 musical artists and, in total, controls around 60% of concert promotions at major concert venues across the country. Live Nation also owns or controls more than 265 concert venues in North America, including more than 60 of the top 100 amphitheaters in the United States. For comparison, its closest rival owns no more than a handful of top amphitheaters. And, of course, through Ticketmaster, Live Nation controls roughly 80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market.

37.    The live music industry, like other heavily concentrated industries, is largely controlled by a well-known group of insiders who lead multiple interconnected companies with numerous conflicts of interest. These insiders have spent decades amassing, fortifying, and exercising power, particularly against anyone who seeks to disrupt the now-standard industry business practices and conduct. These business practices can, and often do, work against the interests of those with relatively little power and influence, especially smaller independent promotors, working musicians and fans. These insiders often speak to each other, and work together, as allies and partners rather than as vigorous competitors.

38.    With this vast scope of power comes influence. Live Nation and its wholly owned subsidiary, Ticketmaster, have used that power and influence to insert themselves at the center and the edges of virtually every aspect of the live music ecosystem. This has given Live Nation and Ticketmaster the opportunity to

freeze innovation and bend the industry to their own benefit. While this may be a boon to Live Nation's bottom line, there is a real cost to Americans.

39.    As described in detail below, today Live Nation possesses and routinely exercises control over which artists perform on what dates at which venues. Through Ticketmaster, Live Nation also possesses and exercises control over how fans are able to purchase tickets to see their favorite artists in concert and what fees those fans will pay to do so. Artists and fans as well as the countless people and other services that support them suffer from the loss of access, dynamism and growth that competition would inevitably usher in.

40.    As this Complaint describes in detail, through a self-reinforcing "flywheel" that Live Nation-Ticketmaster created to connect their multiple interconnected businesses and interests, Live Nation and Ticketmaster have engaged in numerous forms of anticompetitive conduct. That anticompetitive conduct includes the following:

a.    **Retaliating Against Potential Entrants.** Live Nation-Ticketmaster successfully threatened financial retaliation against a firm unless it stopped one of its subsidiaries from competing to gain a foothold in the U.S. concert promotions market.

b.    **Acquiring Competitors and Competitive Threats.** Live Nation-Ticketmaster strategically acquired a number of smaller and regional promoters that it had internally identified as threats. This has undermined competition and impacted artist compensation.

c.    **Threatening and Retaliating Against Venues that Work with Rivals.** Live Nation-Ticketmaster's power in concert promotions means that every live concert venue knows choosing another promoter or ticketer comes with a risk of drawing an adverse reaction from Live Nation-Ticketmaster that would result in losing concerts, revenue, and fans.

d.    **Locking Out Competition with Exclusionary Contracts.**  Live Nation-Ticketmaster locks concert venues into long-term exclusive contracts so that

venues cannot consider or choose rival ticketers or switch to better, more, or cost-effective ticketing technology. These contracts allow Live Nation-Ticketmaster to reduce competitive pressure to improve its own ticketing technology and customer service.

e.    **Blocking Venues from Using Multiple Ticketers.** Live Nation-Ticketmaster's conduct and exclusive contracts prevent new and different promotions and ticketing competitors and business models from emerging. They block venues from being able to use multiple ticketers, who would compete by offering the best mix of prices, fees, quality, and innovation to fans.

f.    **Restricting Artists' Access to Venues.** Live Nation-Ticketmaster has increasingly gained control of key venues, including amphitheaters, through acquisitions, partnerships, and agreements. Live Nation-Ticketmaster restricts artists' use of those venues unless those artists also agree to use their promotion services.

g.    **Acquiring Competitors and Competitive Threats.**    Live Nation-Ticketmaster strategically acquired a number of smaller and regional promoters that it had internally identified as threats. This has undermined competition and impacted artist compensation.

41.    Taken individually and considered together, Live Nation's and Ticketmaster's conduct allows them to exploit their conflicts of interest—as a promoter, ticketer, venue owner, and artist manager—across the live music industry and further entrench their dominant positions. Because Live Nation and Ticketmaster control so much of the concert-going experience, would-be rivals must compete at scale across different levels of the concert ecosystem, raising barriers to competition even further and requiring multi-level entry by existing and would-be competitors.

42.    In the real world, the practical costs of Live Nation's strategy are well-known. Public frustration with concert ticket pricing and sales is a constant drumbeat. The fees that must be paid to attend a live concert in America far exceed

fees in comparable parts of the world. Any fan who has logged onto Ticketmaster's website to buy a concert ticket knows the feeling of shock and frustration as the base cost of the ticket increases dramatically with the addition of fees to include:

    i.            "service" or "convenience" fees,

    ii.            "Platinum" fees,

    iii.            "VIP" fees,

    iv.            "per order" or "handling" fees,

    v.            "payment processing" fees,

    vi.            "facility" fees, and/or

    vii.            any other fee or tax Ticketmaster collects from the fan, often with a cut of that fee going back to Ticketmaster.

43. Whatever the name of the fee and however the fees are packaged and collected, they are essentially a "Ticketmaster Tax" that ultimately raise the price fans pay.

44. Live Nation's anticompetitive conduct has not only harmed fans in the form of more and higher fees, but also undermines innovation. Competition increases the array and quality of services available and makes it easier for fans to find and see artists they love. Unburdened by competition on the merits, Ticketmaster does not need to invest as much to improve the fan experience.

45. Live Nation and Ticketmaster understand the benefits a more open and competitive ticketing ecosystem would bring to fans and others. For example, in 2022, Ticketmaster evaluated and recognized that a more open, non-exclusive ticketing system—in essence, ending its preferred exclusive primary ticketing

    TRIDENT COMPLAINT

relationships—could lead to more competition and threats to its dominance. Instead, Ticketmaster has focused on adding new restrictions to its ticketing systems to force fans to interact with Ticketmaster and thereby facilitate Ticketmaster's ability to increase the amount of data it collects from fans.

46.     This, of course, benefits not only Ticketmaster but also the vast array of related Live Nation businesses and feeds the Live Nation-Ticketmaster flywheel. According to Live Nation's CEO, Ticketmaster "now not only know[s] the person that bought the ticket, but [also] those three people that you are taking to the show, which we [Live Nation] have not known historically." Its data supremacy over rivals has only accelerated.

47.     The impact of the diminished incentive to innovate can manifest in real ways. Without competitive pressure to spur investment and innovation, customer service, website and app design, and product quality and stability suffer. These harms are the natural and predictable consequence of an industry suffocating under monopoly.

48.     The United States and certain States previously tried to protect what should be a dynamic, thriving industry through a Clayton Act Section 7 case and resulting consent decree in 2010, followed by an amended consent decree in 2020. Notwithstanding the prior case under Section 7 of the Clayton Act, Live Nation and Ticketmaster have violated other antitrust laws, namely the Sherman Act, through additional, different, and more expansive forms of anticompetitive conduct and exclusionary practices.

49.     Live Nation's monopoly, and the anticompetitive conduct that protects and maintains its monopoly, strikes a chord precisely because the industry at stake is one that has for generations inspired, entertained, and challenged Americans. Conduct that subverts competition here not only harms the structure of the live music industry and the countless people that work in that industry, but also damages the foundation of creative expression and art that lies at the heart of our personal, social, and political lives.

TRIDENT  COMPLAINT

50.     It is often said that music requires little more than "three chords and the truth." In our modern economy, the live music industry requires that plus competition. Restoring competition protects the ability of working artists and fans to meaningfully access, afford, and engage with music and each other. Addressing and stopping anticompetitive conduct is also essential to ensure the vibrancy of live music. The United States and the Attorneys General of Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming already for the past 12 months have been prosecuting a civil suit in the Federal District Court in New York against Defendants Ticketmaster and Live Nation, including seeking structural relief to stop the anticompetitive conduct arising from Live Nation's monopoly power. See *U.S v. Ticketmaster*, Case No. 1:24-CV-03973 (U.S. District Court, Southern District of Ney York).

51.     In addition, on September 18, 2025, the United States Federal Trade Commission, along with government officials of other states filed a lawsuit in Federal District Court in Los Angeles against Defendants Live Nation and Ticketmaster accusing these two Defendants of charging illegal exorbitant additional fees that push the ticket price way beyond the original published priced. In addition, Live Nation and Ticketmaster are alleged to have engaged in illegal arrangements with ticket scalpers who resell tickets to customers, at grossly inflated prices,  in violation of the Federal Better Online Ticket Sales Act, 15 U.S.C. § 45c ("BOTS Act").  See *U.S. v. Live Nation*, 2:25-cv-08884 (U.S. District Court for the Central District of California).

52.     According to its 2023 securities filings, Defendant Live Nation Entertainment, Inc. is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live

TRIDENT  COMPLAINT

entertainment ticketing sales and marketing company," and it owns, operates, leases, has equity interest in, or has exclusive booking rights for or significant influence over 373 venues globally and more than 265 in North America. This includes more than 60 of the top 100 amphitheaters in the United States that Live Nation either owns or controls through long-term leases or for which it has the exclusive right to determine who performs at the venue. Control over a venue not only confers on Live Nation the ability to dictate whether fans can see a particular artist they love, but in many cases also provides Live Nation control over many aspects of the concert experience and a host of additional revenue streams ranging from sponsorships to food and beverage sales.

53.    Live Nation's business brings in over $22 billion dollars in revenue a year globally. Live Nation divides its business into three segments: Concerts (e.g., promotions, venue management, and music festival production), Ticketing (e.g., Ticketmaster business), and Sponsorship and Advertising. In 2023, Live Nation generated $18.8 billion in Concerts revenue, $2.9 billion for Ticketing, and $1.1 billion for Sponsorship & Advertising.

54.    Defendant Ticketmaster L.L.C. is a wholly owned subsidiary of Live Nation (collectively referred to as "Live Nation" herein). Ticketmaster provides primary and secondary ticketing services, which are responsible, respectively, for selling tickets to fans in the first instance for a show and allowing fans to resell those tickets at a later time. Ticketmaster is by far the largest concert ticketing company in the United States for major concert venues, at least eight times the size of its closest competitor.

H.    **Industry Background**

a) **How Live Concerts Work**

55.    Today's live music concerts are complex productions involving thousands of choices to bring together artists and their fans on a particular date and time. Staging a single concert at a major concert venue—let alone an entire tour—

involves months of preparation and requires the orchestrated support of many intermediaries in multiple roles. Among the decisions that will most impact the overall experience of fans include what venue will host a particular live music experience, who will promote the event, and who will ticket the event.

56.    The planning of a concert predictably begins with an **artist** who decides to share her music and the artistic vision for the presentation of that music with the world and, specifically, with her fans. For artists, the decision to perform live and share music in this medium is an important opportunity to publicly display their art, but also to generate and continue to cultivate enduring relationships with their fans who appreciate and patronize that art. The overall experience associated with what music to present and, critically, how to present it, allows artists to express their artistic vision in a way that will resonate with fans.

57.    While artists strive to ensure fans at a single show appreciate their art, they also work to cultivate that fan base over the long run. This allows artists to maximize their ability to earn money over the arc of their career as compensation for their creative labor, whether it is through more concerts, the sale of more tickets at larger concerts, or the sale of merchandise and other related products and services. As is often publicly reported, the income earned from concerts generally represents a substantial part of artists' compensation for their creative and performance labor.

58.    **Managers and/or agents** typically assist artists to achieve these goals. Managers and agents guide artists' professional lives, including touring, and are often compensated based on a share of the artist's revenues or profit streams. Live Nation manages more than 400 artists in the United States, and in that capacity works with artists, along with other industry intermediaries, to shape their tours and price tickets. One of the founders of Oak View Group, a leading venue development company that partners with Live Nation, also owns a company that is a major manager of artists in the United States music industry.

59.     In the modern era, once an artist decides to perform a concert or go on tour, the first major decision they must make, alongside their manager or agent, is to contract with one or more **promoters**. Promoters are primarily responsible for arranging the concert or tour and promoting the event to the public. Promoters provide a variety of services, including working with artists and their managers and/or agents to help choose the venue(s) to host the concert or tour and determine ticket prices, promoting the concert to the public, and shouldering the financial risk and potential upside if the show or tour underperforms/overperforms in terms of profitability. Promoters are also generally responsible for facilitating payments to the artist, venue, and other vendors associated with the concert or tour.

60.     Artists historically used different promoters for each show in a new city or region of the country. Today, while local promoters may book one or a handful of shows in a local market, touring artists typically use national promoters—principally Live Nation and AEG Presents (a subsidiary of Anschutz Entertainment Group Inc. ("AEG"))—as they can offer a single packaged tour deal.

61.     These deals often include a larger, upfront guaranteed payment to the artist for a national tour with multiple shows across many markets as compared to one-off shows in a single city or region. Through tour deals, national promoters reduce their own risk of not generating enough revenue to cover the artist's guarantee by, in effect, using the profits of successful shows to mitigate the losses of unsuccessful shows within an artist's tour.

62.     Live Nation and its much smaller rival (less than half the size, although even that overstates its competitive significance), AEG, are the two largest concert promoters in the United States. Both Live Nation and AEG also separately provide and are compensated for providing primary ticketing services to venues. No other promoter in the United States can rival their venue networks, scale, reach, and connections to compete to promote national tours for major artists on a regular basis.

63.    The second major decision an artist—supported by their manager and/or agent— must make is which concert **venues** to use at various stops on a national tour. Concert venues are the physical spaces or facilities that host live music. Venues compete to attract artists to perform at their facility, and artists may choose where to perform based on a variety of characteristics, including the venue's ambiance, capacity, location, and acoustics.

64.    Sometimes a venue owner separately contracts with a promoter, like Live Nation, to provide that promoter with financial incentives for booking and promotions services over an extended period of time, which predictably can lead a promoter to steer artists it promotes to perform at the venue. Other times venues provide these incentives on a show-by-show basis.

65.    Venue owners can either operate the facility themselves or hire a management company to operate it. Venue operators provide and maintain the facilities where concerts are held and oversee the venue's services, such as concessions, parking, security, and artist merchandising. Venue operators usually charge the artist, and their promoter rent to use the facility to perform a concert, and the venue operator often works directly with the artist in providing related ancillary services, such as the staging and lighting of a show.

66.    Most artists start their careers performing at smaller venues like clubs or theaters, which offer limited capacities, but at generally lower costs. These venues allow newer artists to develop and grow a relationship with their fans in more intimate settings before moving on to larger venues as their "draw" of fans increases.

67.    As artists grow their fan base, they graduate to larger venues. Major concert venues include large amphitheaters and arenas that are particularly suited to hosting live concerts for popular artists due to their capacity, infrastructure, and amenities. Concerts are a vital source of revenue for these venues.

68.    Live Nation owns, operates, or otherwise controls more than 265 venues across North America. For many years, Live Nation has been the single

TRIDENT  COMPLAINT

largest—and growing—owner of American clubs and theaters, which gives it the unique ability to capture artists early in their careers. As artists grow their popularity, this early access enhances Live Nation's ability to funnel artists through the vast array of Live Nation products and services in the modern live music ecosystem. Live Nation's control over access to so many popular venues across the country gives it outsized power and control in this industry.

69.    Large **amphitheaters**, in particular, are attractive venues for certain popular artists. Amphitheaters are outdoor venues, which allow artists to take advantage of warm weather in the summer months when many artists prefer to tour. Many touring artists like amphitheaters because they generally offer a balance between more seating than clubs and theaters at a more lucrative compensation and more affordable prices for fans, and a more curated and intimate artistic experience than arenas or large festivals.

70.    Large amphitheaters are especially attractive to artists who have graduated from clubs and theaters, but are not yet able to fill higher-capacity arenas on a consistent basis. They also may be attractive to artists who once played in arenas or stadiums but are no longer able to attract the same audience size.

71.    Live Nation controls more than 60% of large amphitheaters in the United States. Live Nation owns, operates, or exclusively books at least 40 of the top 50 and 60 of the top 100 amphitheaters in the United States. No other company in the United States owns more than a handful of amphitheaters, even those with an otherwise sizeable portfolio of arenas.

72.    Today, almost all major concert venues contract with a **primary ticketer** to handle the sale of tickets. Primary ticketers orchestrate the sale of tickets to fans. In the past, tickets for major concert venues were sold through call centers, retail outlets, and box offices, all of which could be operated or offered by different parties. Today, most tickets are sold through the internet and mobile applications and the most common delivery method is electronic delivery to fans' mobile phones.

TRIDENT  COMPLAINT

73.     The vast majority of major concert venues have an exclusive arrangement with a primary ticketer, most often Defendant Ticketmaster, who is entitled to manage and sell tickets on behalf of the initial rights holder—for concerts, this is typically the artist—for all events at that venue. The primary ticketer manages ticketing inventory and provides the technology for online ticketing, accounting, payment processing, and other administrative capabilities. But the management contract for The Greek Theater, signed in 2018, prohibits exclusive ticketing and exclusive concert promotion arrangements.  This has been the "open transparency policy of the Greek Theater since 2018.  Under the Management Agreement between the City and Defendant ASM, The Greek Theater is to be operated as an "Open Building" or an "Open Venue." *See Exhibit "1"*.

74.     Live Nation's subsidiary, Ticketmaster, is the largest primary ticketer in the United States. AEG operates AXS, the second largest primary ticketer in the United States, although it is much smaller than—less than a fifth of the size of—Ticketmaster. Ticketmaster's dominance is especially apparent among major concert venues. In 2022, Ticketmaster's share of primary ticketing for NBA and NHL arenas exceeded 70%, with AXS and Seat Geek trailing. In the past ten years, AXS has not moved a single arena away from Ticketmaster. Live Nation's conduct vitiates many venues' ability to select a primary ticketer on the merits of its ticketing service, significantly disadvantaging Live Nation's rivals when they compete for primary ticketing contracts.

75.     In light of existing market dynamics and Live Nation's conduct, it has been and remains rare for venues in the United States to be "open," which would mean that the dynamism of competition would decide what primary ticketer wins the contract for a particular concert at a particular venue. Instead, primary ticketers, notably Ticketmaster, typically contract to be the exclusive ticketer for a major concert venue for a period of many years, offering venues up-front payments in the form of signing bonuses and sponsorships. Indeed, Ticketmaster's exclusive

contracts cover more than 60% of ticket sales to major concert venues and more than 75% of concert ticket sales to major concert venues.

76.    These exclusive agreements contractually bar any option of having more than one ticketing company offering differentiated services to fans at such venues for a single show or even across shows, with very limited exceptions. This model that locks in the certainty of exclusivity over the dynamism of open competition is an intentional business strategy found in the Ticketmaster-dominated primary ticketing market in the United States, but does not burden competition for such services in many other parts of the world not dominated by Ticketmaster.

77.    In other countries, many venues are "open." For instance, in France, concert tickets are often held in a central inventory management system that is accessible by multiple ticketing companies. And in the United Kingdom, a promoter often allocates bundles of tickets to multiple ticketing providers. No matter the form it takes, an "open" system means that artists, whose incentives for a lower-cost, higher-quality concert experience are more closely aligned with fans, are more likely to play a role in choosing the ticketing company of their choice.

78.    In addition to the primary ticketer, fans can buy tickets through a **secondary ticketing platform**, where individual ticket holders, season ticket holders, or businesses can re- sell tickets to other fans. Secondary ticketing platforms earn revenue through fees paid by the seller of the ticket and, usually, fees paid by the buyer of the ticket as well.

79.    Ticketmaster's ticketing agreements with a venue sometimes entitle Ticketmaster to control secondary ticketing services in addition to primary ticketing services. Ticketmaster's overall share of resale tickets in North America has grown rapidly since 2019, accounting for nearly one third of ticket resales in 2022.

80.    Ticketmaster's rapid increase in secondary market share coincided with its launch of SafeTix technology in or about 2019. SafeTix technology requires that all transfers occur within the Ticketmaster platform. This technology

TRIDENT COMPLAINT

makes it harder for fans to use rivals' secondary ticketing platforms to resell tickets, pushing them instead to the Ticketmaster resale platform.

### b) Money Flows Across the Live Entertainment Industry

81.    Today, artists who perform at a live concert must navigate a complex web of contracts, business relationships, and money flows across numerous intermediaries and participants. These arrangements often result in fees and charges being split among various industry participants in ways that are not always visible to artists, let alone to fans. Importantly, many of these contracts are interdependent, such that increases to one incentivize or directly influence increases in other areas. And at times, the convoluted web of agreements results in one entity paying on behalf of another, only to then recoup portions of those funds for its own benefit.

82.    Today, **fans** pay more in fees associated with live music concert tickets in America than other parts of the world.

83.    An intermediary, like Live Nation, makes money through a series of interconnected agreements it enters into with artists, venues, rival promoters, and fans by virtue of the many "hats" it wears across the industry. Through these agreements, Live Nation has constructed a live entertainment ecosystem in which Live Nation can not only extract revenues at every stage as an intermediary, but on many occasions, also double-dip across multiple business lines—for example, as both a ticketer and a promoter—creating a feedback loop that inflates its fees and revenue, all at the expense of fans.

84.    **Promoters** like Live Nation generate revenue primarily through a pre-agreed split of the gross ticket sales of a show or tour with the **artist** as well as through payments made by **venues** to incentivize the promoter to route its artists to perform at a particular venue.

85.    When trying to secure the right to promote an artist's tour, a promoter and artist often negotiate over the artist's guaranteed payment and the profit split of certain additional concert revenues. For example, Live Nation typically pays an

artist the higher of either (1) a percentage of the gross ticket sales less expenses or (2) the artist's guaranteed payment.

86.    Guaranteed payments are typically based on the number of performances in the tour, length of the promotion contract, and projected ticket sales, while the percentage of the gross ticket sales less expenses is a set percentage. Live Nation will also enter into some multi-tour deals where the artist will earn even larger cash advances today in exchange for the right to promote the artist exclusively for a certain number of performances or a specific amount of time.

87.    While Live Nation sweetens the upfront incentives for certain artists by offering these larger cash advances, they extract recompense in other parts of the ecosystem by, for example, routing their promoted artists through Live Nation's owned and controlled venues or venues exclusively ticketed by Ticketmaster. For other artists, Live Nation typically conditions use of its owned or controlled venues (especially large amphitheaters) on an artist signing with Live Nation as promoter.

88.    In addition to contracting with artists for promotion services, Live Nation, as a **promoter**, also frequently and separately contracts with **venues** to provide booking and promotions services, in exchange for a cut of the venue's revenues associated with the shows it brings to the venue and, occasionally, even a cut from shows that rival promoters bring to the venue. These agreements can come in a variety of forms and are known as "rebate deals," "co- promotion deals," or "drawbacks." These revenues generally are not added to the pool of money Live Nation splits with artists. In fact, some of these payments functionally remit money back to Live Nation that Live Nation initially paid to venues on behalf of its artists (e.g., facility rental fee rebates).

89.    These deals—through which Live Nation can essentially claw back a show's expenditures—reflect Live Nation's power over venues, derived from its influence over artists' decisions about what venues to play and when. Over the past

few years, Live Nation has continued to increase its concert promotions fees imposed on venues, which are passed through to fans.

90.    Ticketmaster, as **primary ticketer**, collects both the face value of the ticket as well as a host of fees tacked on top of the face value ("primary ticketing fees"). Ticketmaster, owned by Live Nation, retains a portion of the fees. The remaining fees are remitted to other intermediaries like the venue and promoter, which are often Live Nation-owned entities, amounting to paying several of these fees (or portions thereof) to itself.

91.    **"Ticketing" Fees.** Americans are well-acquainted with the numerous and different fees appended to the cost of a single ticket to attend a concert today. The numerous fees that are added on top of each other—often with little visibility offered to the fan buying the ticket—contribute to Live Nation's nearly 40% adjusted operating margin in 2023 for its global ticketing business. In addition to charging those fees, Ticketmaster often offers consumers the ability to purchase ticket insurance and "upsells" (such as the option to add parking) at checkout, and it retains a "cut" of these revenues as well. The fees can include, for example:

a)    *"Service" or "Convenience" Fees*. Service fees, sometimes called convenience fees, are negotiated between the venue and the ticketer and can be set in a variety of ways. Sometimes the ticketer will receive an agreed-upon dollar amount and/or an agreed-upon percentage of the service fee. Alternatively, the venue and ticketer might agree in advance as to the actual fee that the fan will pay for any event and how to split that. Sometimes, the ticketer will receive a fee based on the face value of the ticket. Under any of those models, the ultimate fee that the consumer pays results from the negotiation between the ticketer and the venue. Generally, under these models, the higher the ticket price, the higher the ticketing fee. As a result, the fee has no meaningful relation to the actual cost of providing the ticketing service, which would not vary ticket by ticket or show by show.

b)    *"Platinum" and "Pricemaster" Fees*. Not all primary tickets, however, are subject to the typical "service" fees. Ticketmaster has two dynamic pricing

tools, Platinum and Pricemaster. For tickets that are dynamically priced by Ticketmaster, consumers often pay higher ticketing fees. Ticketmaster additionally receives an "inside fee" from the promoter amounting to a double dip by Ticketmaster.

c)     *"Per Order" (or "Handling") Fees*, which are additional ticketing service fees charged on top of each order, separate and apart from the ticketing fees embedded in the service charge. These are often split between the ticketer and the venue.

d)     *"Payment Processing" Fees*, which are additional fees charged on certain transactions for processing the electronic payment inherently necessary to purchase any electronically delivered ticket.

e)     *"Facility" Fees*, which are fees charged by some venues and typically remitted in full to the venue.

92.     Although venues retain some proportion of ticketing fees described above, a significant proportion of the venue's share is often passed onto promoters, like Live Nation, to incentivize them to steer content to their venue.

93.     The face values of tickets are typically set or approved by artists, although promoters' offers also influence face values. Artists, in consultation with their manager and the promoter (either or both of which might be Live Nation employees), can also decide to enable dynamic pricing through Ticketmaster's two dynamic pricing tools, Pricemaster and Platinum, which allow face values to increase based upon the level of demand for a given concert. Promoters and venues use Ticketmaster's Pricemaster tool for "bulk" dynamic pricing of groups of seats, while Platinum tickets, on the other hand, are used to dynamically price at the seat level.

94.     For tickets that are dynamically priced by Ticketmaster, whether as bulk or at the seat level, consumers often pay much higher face values. Ticketmaster has a pricing team that makes pricing recommendations—including recommendations as to average and minimum face value of tickets. And typically,

it is Ticketmaster's own pricing team that adjusts the face value of tickets based on demand for a particular show.

95.    **Venues** earn revenue by renting their facilities to the artist and promoter, selling food, beverages, and merchandise to patrons, collecting ticketing and parking fees, and— sometimes—by sharing in the profit from concerts through co-promotion agreements with promoters such as Live Nation. When venues set aspects of ticket fees, they must not only account for their own operating costs, but also ensure the fees are sufficient to cover all the payments the venues must make to intermediaries like promoters and ticketers.

96.    For example, venues must ensure the additional ticket fees cover the fee charged by the primary ticketing service (generally Ticketmaster) and offset the various payments they must make to the promoter (often Live Nation). Because of the interrelated nature of contracts in the industry, money often flows in multiple directions to and from various intermediaries, sometimes in both directions for a single show.

97.    Live Nation tells the public that the service fees are decided by the venue. While it is nominally true that "[t]he venue decides on the service fees," in reality, these decisions are predicated upon the portion of those fees that Live Nation (via Ticketmaster) will retain in the first instance—an amount Live Nation negotiates with each venue in advance of the venue setting the amount of the fee.

98.    This arrangement is consistent with the many other fees extracted at various stages; those fees may superficially be set by a market participant other than Live Nation or Ticketmaster, but Live Nation and Ticketmaster nonetheless have a hand in setting nearly all these fees and often benefit financially from a significant portion of these fees.

99.    In other words, Live Nation's various contracts operate together to drive up the overall number and size of fees paid by fans. For example, under many Ticketmaster contracts, when venues increase their own fees to offset Live Nation's concert promotion charges, Ticketmaster is entitled to receive a "ticketing" fee.

This double-dip by Live Nation (as promoter) and Ticketmaster (as ticketer) means venues have to raise fan-paid fees just to offset Live Nation's promotions charges. For example, a venue forced to pay Live Nation a $5 promotions rebate and Ticketmaster a portion of any increased fees would need to raise fees on fans by significantly more than $5 to break even.

100.  **Secondary ticketing** providers earn revenue through fees paid by the seller of the ticket and, usually, the buyer of the ticket as well. Ticketmaster provides secondary ticketing services via "TM+" to venues when it provides primary ticketing services to the venue hosting the event. Ticketmaster also sells secondary tickets via its "3PE" tool when it does not provide primary ticketing services to the venue hosting the event.

101.  In addition to the fees Live Nation extracts under its ticketing and promotions contracts, Live Nation also generates significant revenues from its **sponsorship and advertising** business. Live Nation takes advantage of its vast network of venues and high volume of tickets to secure substantial sponsorship and advertising revenue—further deepening its pool of profits. It sells signage rights, online advertising, beverage pouring rights, venue-naming rights, and more. Live Nation considers its sponsorship and advertising business to be one of its high-margin businesses.

102.  Live Nation is able to extract significant revenues through its sponsorship and advertising business in part by controlling access to fans at performances where advertisers want to reach them. By controlling the vast majority of large amphitheaters in the United States— pushing concerts to venues it owns, operates, and/or exclusively tickets; locking in key artist talent; and growing the massive data trove it has accumulated as a ticketer—Live Nation is able to drive substantial advertising revenue that feeds the rest of its business.

### c)  Live Nation's "Flywheel"

103.  Founded in 1996, Live Nation began as a live events promoter. Over the following three decades, Live Nation expanded its reach across nearly the entire

live entertainment industry—live events promotions, primary ticketing, secondary ticketing, venue ownership and operations, music festivals, artist management, sponsorships, and more. Live Nation controls wide swaths of live music in the United States because of its multidimensional power.

104. Live Nation uses its concert promotion business—the core of its "flywheel"—to feed its other high margin businesses, including Ticketmaster's ticketing business, Live Nation's network of venues, as well as Live Nation's sponsorship and advertising business.

105. As Live Nation's CEO put it, concert promotion is the business that gives the company control over content that feeds Live Nation's three high margin businesses:

"At the core is our flywheel. It's the concert business . . . It's the lower margin part of our business. But in order to get into these three high margin businesses and be competitive, we have to have that scale [in concerts] . . . [Our] leadership position [in concerts] drives the three high margin businesses that are driving our true cash flow and EBITDA."

106. The modified graphic below, based upon Live Nation documents, demonstrates how the flywheel entrenches Live Nation's profits and power.

107. Live Nation wields its power in concert promotions to fuel and drive its primary ticketing business. This presents a Hobson's choice for major concert venues that Live Nation does not already own or otherwise control: either choose Ticketmaster as their exclusive provider of primary ticketing services and benefit from access to Live Nation concerts, or choose a rival ticketing company and risk losing access to Live Nation concerts. Losing access to even a portion of Live Nation's tours can seriously harm venues that rely on highly profitable concerts.

108. Live Nation does not have to threaten individual venues explicitly (although it does) to discourage them from signing ticketing contracts with competitors. The risks are well- known in the industry, and Live Nation's topmost executives remain outspoken that Live Nation likely will steer concerts away from

TRIDENT  COMPLAINT

independent venues that do not select Ticketmaster as their ticketer. Live Nation's CEO publicly acknowledged as much in not-so-subtle terms:

"We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." … [But] **we have to put the show where we make the most economics, and maybe that venue [that wants to use a different ticketing platform] won't be the best economic place anymore because we don't hold the revenue**."

109.   The power and profits from Live Nation's high-margin businesses (including Ticketmaster and Sponsorship & Advertising) help keep the flywheel spinning by financially fueling (what may appear on paper to be) Live Nation's less profitable promotions business. Live Nation can do this in a number of ways. For example, for top artists, Live Nation can use profits from other business lines to fund break-even or even unprofitable exclusive promotion contracts on a standalone basis to keep feeding the flywheel.

110.   Rival promoters often find themselves unable to match Live Nation's offers to artists because Live Nation can subsidize artist offers with profits from ticketing and other higher margin businesses. (Of course, some of Live Nation's exclusionary conduct also is aimed at weakening or eliminating rivals, and reducing the amount Live Nation needs to bid to win artists' business). At the same time, artists who do not choose Live Nation to promote their shows or tours can find themselves locked out of Live Nation owned and controlled venues, including Live Nation's large stable of amphitheaters that are more accessible for fans.

111.   Live Nation also uses consumer data—acquired through primary and secondary ticketing sales—to augment its ability to feed its flywheel. As Live Nation's CEO put it: "No one has 80 million customers segmented in a database as rich as ours . . . that audience and that platform is really the key, unique part of our business."

112.   As described below, Live Nation's conduct and anticompetitive scheme further creates and enhances barriers for rivals and nascent threats while

cementing Live Nation's grip on nearly every corner of this ecosystem. Industry participants recognize that rivals must participate at scale and at multiple points of the concert ecosystem to compete effectively with Live Nation. For example:

b.     Live Nation's self-reinforcing conduct and power in promotions, ticketing, and venue access disadvantages rivals that do not have a similar portfolio of intertwined assets, increasing barriers for those that do not enter and expand in multiple markets simultaneously.

c.     Ticketing rivals must invest in and develop ticketing systems robust enough to handle high-demand on-sale events for popular artists, fraud/protection and credit card access for fans, and back-office support. Rival ticketers must also accumulate sufficient data to target, market, and advertise shows to fans, as well as sufficient working capital to secure business, all at a time when there are limited opportunities to even compete to dislodge Ticketmaster's monopoly that is maintained by long-term, exclusive ticketing contracts and the content threat and thereby recoup this investment.

d.     Promotions rivals face similar obstacles. They need significant capital to fund tour payments (often millions of dollars), enough scale to hedge against the risk of any single tour failing, extensive relationships with artists, artist managers, agents, and venue operators (and, on the flip side, willingness of those market participants to use a competitor without the fear of retaliation by Live Nation or its surrogates), and enough experience and data from previous tours to make effective routing and pricing recommendations to artists.

### d)   History of Live Nation and Ticketmaster

113.   SFX Entertainment, which later became Live Nation, was founded in 1996 and rapidly began rolling up smaller entertainment companies to consolidate power in concert promotions. That strategy continues today. As Live Nation's current CEO has explained, this strategy of consolidation "from day one" is part of the company's DNA: "we want to continually be the largest promoter in the world,

have as many boots on the ground in as many cities and countries in the world as possible …."

114. Ticketmaster, Inc. was founded in 1976 as an independent ticketing company. It has been the largest primary ticketer for major concert venues for decades. Like Live Nation, Ticketmaster initially rose to power in part through a series of acquisitions that consolidated the company's dominant position in primary ticketing. Ticketmaster also expanded and cemented its dominance by pushing through changes to the structure of ticketing contracts that reduced competitive pressures to lower ticketing fees that are ultimately borne by fans.

115. Ticketmaster restructured how ticketing companies get paid for their services. Venues used to pay ticketing service companies to ticket events. But in the early 1980s, Ticketmaster started passing more ticketing costs onto consumers (who effectively have no choice in selecting the ticketer) in the form of fees, and then sharing some of the additional revenue with venues. Second, Ticketmaster began paying venues large upfront advances in exchange for the exclusive, multi-year right to sell and distribute their tickets.

116. On February 10, 2009, Live Nation (then known as Live Nation, Inc.) and Ticketmaster (then known as Ticketmaster Entertainment, Inc.), agreed to merge. At the time, Live Nation was an emerging direct competitor to Ticketmaster in primary ticketing services: after spending nearly two years evaluating, licensing, and developing its own ticketing platform, Live Nation had rapidly become America's second-largest primary ticketer at major concert venues.

117. Alleging the merger would likely substantially lessen competition in the provision and sale of primary ticketing services for major concert venues, the United States and nineteen states filed a case,  challenging the merger under Section 7 of the Clayton Act, 15 U.S.C. § 18.  The parties agreed to a consent decree, entered as a final judgment in the Section 7 case on July 30, 2010, allowing the merger to proceed subject to certain conditions.

TRIDENT  COMPLAINT

118.   In January 2020, the United States filed a motion to modify the consent decree in the Section 7 case.  Ticketmaster and Live Nation denied the allegations but ultimately agreed to the United States' and some state co-Plaintiff' proposed amendments to the consent decree. The court entered the amended consent decree as an amended final judgment that, among other things, partially extended the decree's effective date through December 31, 2025.  The court then closed the Section 7 case on February 29, 2020.  Several of the plaintiff states here were not parties to the 2010 or 2020 decrees.

119.   In the years since, Live Nation and Ticketmaster have committed additional, different, and more expansive violations of the antitrust laws compared to the narrower scope of the Section 7 case. As detailed below, Live Nation and Ticketmaster have engaged in ongoing unlawful monopolization of markets across the concert industry in violation of Section 2 of the Sherman Act and state analogues. For example, since 2020, Live Nation and Ticketmaster have unlawfully coopted actual and potential rivals to remove competitive threats and cement Live Nation's and Ticketmaster's dominance of the concert industry.

120.   In addition, as also detailed below, Live Nation and Ticketmaster have violated Section 1 of the Sherman Act and state analogues. For example, since 2020, Ticketmaster has entered into long-term exclusive ticketing agreements with venues. The Section 7 consent decree—which addressed a claim different from those at issue here—has failed to restrain Live Nation and Ticketmaster from violating other antitrust laws in increasingly serious ways.

121.   The conduct of Defendants Live Nation and Ticketmaster is particularly egregious given the illegal cooperation and illegal assistance provided to Defendants Live Nation and Ticketmaster by the following Defendants :

a.      ASM, in its role as Manager of The Greek Theater, a public venue owned by the City of Los Angeles;

b.      The City of Los Angeles, which owns and ultimately is responsible for the operation of the publicly owned concert known as The Greek Theater;

c.    Mayor Karen Bass, who appointed the five Commissioners who oversee the City's Department of Recreation and Parks,

d.    The five (5) Commissioners, appointed by Mayor Bass, who oversee the operations of the City's Department of Recreation and Parks, namely Marie Lloyd, Fiona Hutton, Benny Tran, Luis Sanchez, and Renata Simril.  Their duties include direct oversight of the publicly owned venue known as The Greek Theater; and    e.  Kristin Sten, General Manager of The Greek Theater.

## II.    LIVE NATION MAINTAINS MONOPOLIES AND MARKET POWER ACROSS THE LIVE CONCERT ECOSYSTEM THROUGH AN ANTICOMPETITIVE AND EXCLUSIONARY COURSE OF CONDUCT

122.   Live Nation maintains and exercises its power through a coordinated pattern of anticompetitive conduct that serves a variety of ends: expanding its scope and reach into every crevice of an increasingly more complex and interconnected ecosystem, eliminating rivals, continuing to increase barriers to entry, and inhibiting competition on the merits. Each act is exclusionary on its own. But the acts also work together across the ecosystem, enhanced by the flywheel and scale effects, to magnify the anticompetitive force of the scheme.

123.   Live Nation's strategy includes several forms of anticompetitive conduct across its various intermediary roles that work in harmony to protect Live Nation's power and keep rivals at bay. For example:

a.    Live Nation enters into agreements with rivals not only to remove them, but also to cement and expand its dominance.

b.    Live Nation engages in threats (directly or through intermediaries) and pressure campaigns to nullify rivals or nascent threats.

c.    Live Nation relies on "carrots and sticks" to induce venues to sign long-term exclusive ticketing contracts that offer durable protection for Ticketmaster's dominance. Venues have seen that if they sign with a Ticketmaster competitor, they risk losing lucrative Live Nation concerts and may suffer other harmful retaliation.

TRIDENT  COMPLAINT

d.     Live Nation conditions artists' access to its vast and desirable network of amphitheaters and other venues on choosing Live Nation as the promoter, which enables the company to expand its control over artists and third-party venues alike.

e.     Live Nation removes and neutralizes potential competitors and nascent threats via acquisitions, joint ventures, and other contractual agreements.

f.     Using "carrots" and "sticks", Live Nation locks venues into exclusive long term ticketing agreements with Ticketmaster that shots out competition

124.   Live Nation puts a "choice" to venues: use Ticketmaster and potentially receive a significant payment for long-term exclusivity or use another ticketer and risk losing access to the vast array of Live Nation assets, including lucrative concerts. Sometimes Live Nation is bold and communicates this threat directly. Other times, the expression of the threat may be implicit, but the meaning is self-evident. And in some circumstances, Live Nation deploys its extensive network of intermediaries to communicate this "choice." Sometimes, the "choice" does not have to be communicated at all. It is well understood across the live concert industry, as a result of Live Nation's historical conduct and exactly as Live Nation intended, that choosing ticketers other than Ticketmaster carries enormous risk and financial pain.

125.   Live Nation's reputation and history of retaliation are so well known in the industry that Live Nation does not have to (although it still does) explicitly threaten individual venues. Instead, its threats have become more public and generalized. As Live Nation's CEO told the industry in 2019, Live Nation's concert promotions business decides to host concerts "where we make the most economics," which usually means venues where Ticketmaster holds the primary ticketing contract. Venues considering primary ticketing options understand all too well the risks of switching to another ticketer, and some even model the loss they would suffer if they switched and lost access to some of Live Nation's concerts. The threat of steering shows away from venues allows Live Nation to exercise its

monopoly power to get better promotions deals and impose Ticketmaster on venues.

126.   Live Nation has a number of punitive tools it can use to retaliate against venues, even without making good on the catastrophic threat of pulling or moving concerts completely. In addition to reducing the number of concerts it places at a venue, Live Nation has the power to move shows to less desirable and less lucrative dates, curtail promotional efforts, and force venues to disable secondary ticketing on non-Ticketmaster platforms (potentially making unsure fans less likely to commit to tickets in the first place and frustrating fans who do buy tickets but change plans).

127.   These kinds of threats and punishments are not just how Live Nation acquired its outsized power in every corner of this industry. In fact, Live Nation has continued to use this playbook in recent years. For example, in 2021, Live Nation threatened retaliation against a venue that had decided to switch from Ticketmaster to SeatGeek for primary ticketing. That venue had decided to switch, in part, because SeatGeek offered to share a greater percentage of the fees associated with secondary ticketing.

128.   Upon learning about the potential switch, a senior Live Nation executive texted a not-so-subtle warning to the venue's CEO: "Apparently seatgeek are telling [nearby venue] and others that they have a contract deal with you guys already?? Anyways should think about bigger relationship with LN not just who is writing a bigger sponsorship check." A few days later, Live Nation's CEO emailed the venue's owner that Live Nation "will be very concerned that seatgeek a secondary provider will be selling our LN artist tickets when not authorized by the artist."

129.   Once the venue switched to SeatGeek, Live Nation followed through on its threats, re-routing concerts to other venues. Live Nation's promotions business also demanded that the venue disable secondary ticketing on SeatGeek's

platform for all Live Nation-promoted concerts, depriving the venue and SeatGeek of secondary fee revenue.

130.    Live Nation eventually relented and allowed the venue to enable secondary ticket sales—but only after (a) the venue agreed to split its share of secondary fee revenue (sourced through SeatGeek) with Live Nation, and (b) SeatGeek agreed to change its ticket-buying interface to make it conform, in some respects, to Ticketmaster's without regard to whether that was what fans or the venue preferred. In particular, Live Nation demanded that SeatGeek change the way it distinguished primary and secondary tickets (to make it more like Ticketmaster) and limit the use of its fan-friendly tool called "DealScore." Given all of Live Nation's complaints, which it directed to the venue, it is unsurprising that within about a year, that venue returned to Ticketmaster.

131.    The knowledge and awareness in the industry—that Live Nation will route shows away from venues that do not choose Ticketmaster—is so widespread that other intermediaries deliver threats and warnings to venues for Live Nation's benefit. For example, Oak View Group, Live Nation's self-described "hammer," has made such threats to at least one venue. And at least one other venue has been warned by a rival CEO that Live Nation would move shows away from the venue if it selected SeatGeek for primary ticketing services.

132.    Even Live Nation's biggest competitors fear losing concerts if they do not use Ticketmaster. Live Nation's principal competitor, AEG, has an approximately 30% ownership stake in Anschutz, Spectacor Management ("ASM Global"), a venue management company that manages more than 30 arenas in the United States through its subsidiary, Defendant ASM Theater Management ("ASM"). Defendant ASM manages the Greek Theater under a Management Agreement executed in 2018.

133.    ASM Global resulted from a 2019 merger between AEG Facilities and Spectacor Management Group ("SMG").

TRIDENT  COMPLAINT

134.   Before the merger, SMG's legacy venues had used Ticketmaster as their exclusive primary ticketer, and AEG Facilities' legacy venues had used AXS as their exclusive primary ticketer. Through its minority interest in ASM Global, AEG advocated for AXS to serve as the exclusive primary ticketer for the ASM Global venues AEG now partially owned.

135.   But ASM Global's majority shareholder, Onex, worried that Live Nation would retaliate by withholding shows from ASM Global venues if ASM Global entirely switched away from using Ticketmaster. Consequently, ASM with either explicit or implicit approval from the five Defendant Commissioners of the City DRP, who were appointed by Defendant Mayor Bass, has quietly given Defendant Ticketmaster exclusive ticketing for the Greek Theater despite the 2018 Management Agreement mandating otherwise.

136.   **To avoid losing access to concerts at ASM Global venues by "alienating" Live Nation, AEG was forced to accept that Ticketmaster would remain the dominant provider at ASM Global venues (such as The Greek Theater, a venue owned by the City of Los Angeles)** despite AEG's partial ownership of ASM Global and AEG's ability to provide an alternative primary ticketer, AXS. AEG agreed Ticketmaster would remain the default primary ticketer for most ASM Global venues, with AEG reserving the right to use AXS for events promoted by AEG.

137.   These threats—whether direct or indirect, explicit or implicit— coupled with Live Nation's multi-pronged strategy of long-term exclusive agreements, a history of retaliation, and other exclusionary conduct—means neither venues nor artists are free to choose ticketers based on their own assessment of price, quality, or value. They are not free to choose a ticketer based on the best technology, or most favorable contract terms, or simply what works best for them or—importantly—what works best for the fans that fill venues to see their favorite artists.

TRIDENT  COMPLAINT

138.   Instead, venues, artists, fans, rivals, and others throughout the live concert industry must navigate an ecosystem created by Live Nation, defined by its dominance in promotions *and* ticketing, together with its extensive network of venues (especially amphitheaters), and limited by Live Nation's restrictions and restraints.

139.   Ticketmaster's long-term exclusive agreements with venues are designed to lock out competition, which forecloses a substantial share of primary ticketing markets.

140.   Ticketmaster's long-term, exclusive agreements with venues are a key tool to protect Live Nation's stranglehold on the live concert industry, and on primary ticketing in particular. These agreements make Ticketmaster the sole provider of primary ticketing services for all or nearly all events held at a venue for multiple years, sometimes as long as 14 years.

141.   Ticketmaster's exclusive agreements cover more than 75% of concert ticket sales at major concert venues, foreclosing a substantial share of the primary ticketing market from rival ticketers. In 2022 alone, for example, Ticketmaster signed several lengthy deals with major concert venues.

142.   Ticketmaster is quite clear about why it focuses on these deals: they are, in Ticketmaster's own words, a "[h]edge against significant improvements by the competition or even a new competitor" because the "client is under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an extended time." In other words, even if a rival ticketer were to offer a better price, a better product, or simply a better ticketing experience, a Ticketmaster-exclusive venue would not be able to choose the rival for a long time, often a decade.

143.   Before its long-term exclusive agreements expire, Ticketmaster also works defensively to deny rivals the opportunity to compete at all. Ticketmaster often renews or extends these ticketing agreements before they expire, thus preventing rivals like SeatGeek and AXS from being able to bid at all. This not

41                                      TRIDENT  COMPLAINT

only eliminates the chance Ticketmaster will lose the contract but also mitigates competitive pressure on Ticketmaster to improve the terms of the contract.

144.    To ensure their existing locked-in venues agree to early renewals and thereby block competition from a rival for the contract, Ticketmaster used COVID-19 as an opportunity to extend the terms of its existing long-term venue ticketing agreements by one year. After one venue resisted, telling Ticketmaster that it disagreed and intended to sign with a rival, Ticketmaster's counsel wrote: "Any effort by [the venue] to switch ticketing service providers before [the extension date] would be a breach of contract, and any announced intention to do so would be an anticipatory breach."

145.    In a conversation between that venue's CEO and Live Nation executives, Live Nation's CFO indicated Live Nation would "drop" the contractual dispute if the venue agreed to enter into a new ticketing contract with Ticketmaster, but not if the venue went with a rival.

146.    Ticketmaster's renewal strategy not only blocks potential rivals but also creates friction—legal costs and otherwise—to ensure venues do not even try to pursue a competitive bidding process.

147.    These strategies are part of a deliberate and defensive series of actions and decisions designed to lock up venues, lock out competitors, and hold the industry hostage from innovation and evolution. It is well recognized that "opening" venues, that is, eliminating exclusivity to permit multiple primary ticketers to service a venue or a particular concert, could benefit fans.

148.    Open venues, such as The Greek Theater, can make it easier for fans to find tickets via multiple platforms and those platforms would be incentivized (in terms of price and technology) to compete for fans' purchases. Venues, too, could benefit, because having multiple ticketers would enable venues to increase the number of tickets sold, exercise greater choice over how tickets are sold or resold, and reach new audiences.

TRIDENT  COMPLAINT

149.    When venues have proposed non-exclusive ticketing contracts, Ticketmaster has almost invariably rejected the request, even outside the live concerts space. And even though Live Nation agreed to limited non-exclusivity for AEG-promoted shows at certain ASM Global venues as part of its recent contract negotiation—to dislodge its largest ticketing rival (AEG's AXS) from the very venues that its largest promotions rival (AEG) partially owns—Ticketmaster has refused to even consider it for other venues. If AEG must acquiesce to Live Nation's demands that Ticketmaster exclusively ticket every show at AEG's own affiliated venues—save those shows promoted by AEG—no other major concert venue owner stands a chance.

150.    While the industry and fans would benefit from "opening," Ticketmaster—as the incumbent monopolist—and its parent company, Live Nation, knows it would not. For Ticketmaster, the success of exclusivity combined with Ticketmaster's already high market share in the United States are fool-proof ways to maintain its empire, the benefits of which are reflected in Ticketmaster's bottom line. Primary ticketing fees are far higher in the United States than in other countries around the world.

151.    Ticketmaster's exclusive agreements also inhibit the growth of more specialized ticketing services and different business models. For example, Ticketmaster's exclusivity provisions deny most artists the ability to sell tickets directly to their most passionate fans and "fan clubs" through pre-sale windows. Since third parties often charge less than Ticketmaster, when selling to fan clubs through non-Ticketmaster ticketing systems, artists are better able to control ticketing fees. Through fan clubs or other alternative ticket distribution methods, artists can also offer tickets alongside other experiences and opportunities that can improve the concert experience or increase value for fans.

152.    Alternative distribution methods can also provide artists greater control over how, when, and to whom tickets are made available. Ticketmaster previously allowed tickets to be sold through third parties to fan clubs in

accordance with its Fan Club Policy. But after acquiring one such third-party provider of tickets to fan clubs in 2018, Ticketmaster has used its exclusive ticketing contracts with venues to curtail artists' ability to use third-party providers for fan club sales—at the expense of artists' choice and their relationships with fans.

153.   Ticketmaster further uses its extensive network of long-term exclusive ticketing contracts to raise the costs of rival ticketers and further heighten barriers to entry. For example, in the areas where despite Ticketmaster's best efforts, competitors still persist, Ticketmaster deploys its vast power and network to protect its monopoly. One example of this is Ticketmaster's encrypted mobile ticket program, SafeTix, Ticketmaster has added SafeTix to its suite of products and services in a manner that protects its position in primary ticketing, expands its position in secondary ticketing, and undercuts the ability of rival ticketers to compete in either aspect of ticketing.

154.   Pursuant to this program, Ticketmaster replaced the static barcodes on PDF—or other types of electronic tickets—with a constantly refreshing and encrypted barcode. Ticketmaster's SafeTix marketed this change as reducing the risk of ticket fraud from stolen or illegal counterfeit tickets. But the transfer restrictions implemented as part of this change also make it more difficult for a fan who wishes to buy or sell a SafeTix-encrypted ticket through a secondary platform to use a rival platform like StubHub or SeatGeek.

155.   Further, SafeTix introduces uncertainty as to when, or even whether, that ticket can even be transferred. If a ticketholder wants to sell or otherwise transfer a SafeTix-encrypted ticket, both the ticketholder and the purchaser must create Ticketmaster accounts (thereby providing Ticketmaster with their data), download the Ticketmaster app, and wait for Ticketmaster to determine when or whether the transfer can be completed.

156.   By reducing the incentives to enter secondary ticketing altogether, SafeTix not only reduces competition from existing rivals but also disincentivizes

prospective innovators from considering secondary ticketing as a viable foothold for entering primary ticketing.

157.   In addition to inserting Ticketmaster as an intermediary into secondary ticket transfers and transactions, SafeTix has also fortified Live Nation's data advantages over its rivals. According to internal documents, SafeTix was expected to grow the "size/value of the TM database," already by far the largest of any ticketer, by as much as 30 to 40%.

158.   As Live Nation's CEO put it, "[o]ne of the advantages we've launched under the transfer strategy is we now not only know the person that bought the ticket, but we're going to know those three people that you are taking to the show, which we have not known historically." Live Nation can monetize this unique trove of data in its various businesses to both increase its bottom line and further entrench its positions across the live entertainment industry.

a)   **Live Nation restricts access to its venues unless Live Nation is paid to be the promoter.**

159.   Live Nation's control over a significant number of concert venues not only facilitates maintenance of Ticketmaster's monopoly in ticketing but also serves to limit artists' options and exclude rival promoters. Live Nation has a longstanding policy going back more than a decade of preventing artists who prefer and choose third-party promoters from using its venues. In other words, if an artist wants to use a Live Nation venue as part of a tour, he or she almost always must contract with Live Nation as the tour's concert promoter.

160.   Live Nation's policy of restricting the use of its venues is particularly problematic for artists seeking to tour in large amphitheaters where Live Nation enjoys monopoly power. These artists—many of whom have well-established, dedicated fan bases but have not yet matured their fan base to play larger stadiums—are effectively forced to hire Live Nation as their promoter or risk being locked out of dozens of desirable Live Nation-controlled large amphitheaters in the

United States. Live Nation's amphitheater portfolio includes at least 40 of the top 50, and more than 60 of the top 100 amphitheaters in the United States.

161.   No other entity owns more than a handful of amphitheaters in either set. This network of large amphitheaters has allowed Live Nation to attain a greater than 70% market share in large amphitheater promotions and become by far the largest promoter of national amphitheater tours. Put differently, it is nearly impossible for an artist to create a tour that includes stops at amphitheaters without Live Nation.

162.   Live Nation senior executives know the company has restricted the use of its amphitheaters and other venues for years and often make the choice to sacrifice additional profits the company could be earning as a venue owner by opening its venues to non-Live Nation promoted shows that are available to play at those venues. A 2018 internal Live Nation analysis found that its top 10 amphitheaters are "dark," or without shows, "on nearly 50% of their Saturdays in the summer," the highest performing day of the week during the primary performance season. Relatedly, a 2022 analysis found that Live Nation's top 15 amphitheaters are, on average, dark on eight Saturdays between June and September.

163.   Live Nation also recognizes its amphitheater portfolio gives it control over artists pursuing an amphitheater tour. For example, a senior Live Nation executive directed his employees not to increase guaranteed payments offered to artists they know are looking for "True Amp Tours." This is because Live Nation recognizes these artists almost certainly will need to play several shows at Live Nation's stable of top amphitheaters, and to do so, they will need to sign with Live Nation as their promoter: "we know [artists] are likely playing amphitheaters and we are going to get those in most cases."

164.   Because many artists sign with Live Nation to promote their entire tour—both amphitheater and non-amphitheater shows alike—Live Nation's restrictive amphitheater policies help the company extend its reach to promoting

46                                                   TRIDENT  COMPLAINT

artists in other venues as well. Further, because relationships are so important in the promotions business, once Live Nation uses its exclusionary amphitheater policy to lock in emerging artists early in their careers, they are able to keep some of those artists as they graduate to higher capacity venues, such as arenas and stadiums.

**b) Live Nation strategically acquires promoters, venues, and festivals to eliminate rivals, expand its network, and grow its "moat"**

165.    To protect and expand its positions across the live entertainment industry, Live Nation has pursued a strategy of acquiring nascent threats and neutralizing rivals. This strategy has included acquiring promoters, amphitheaters, festivals, other venues, and even small ticketers, as well as entering into long-term exclusive booking contracts with many venues. Although many of these rivals were relatively small at the time of their acquisitions, Live Nation's internal documents show that the company viewed them as some of its "biggest" threats.

166.    This is unsurprising given the lack of sizeable, scaled, national competitors in the markets in which Live Nation operates. Live Nation's conduct has thwarted growth of its rivals and disincentivized investment that might have led to entry. Nonetheless, Live Nation viewed many of these acquisitions of competitors on the "edge" as necessary to protect its "moat" around the live concert ecosystem.

167.    In its own words: "Live Nation is a company founded on acquisition. At its inception, Live Nation began rolling up the regional world of promoters and venues and has not stopped since." Over the past decade, Live Nation has acquired dozens of companies across the industry to expand its reach and entrench its positions.

168.    Live Nation has recognized that one of its "Biggest Competitor Threats" is smaller and regional independent promoters that have the ability to "com[e] in from the edges creating events, opening venues, and purchasing artist inventory." To address this disruptive potential, Live Nation pursued an aggressive plan to acquire or co-opt key independent promoters, even when the economics of a

particular deal did not make sense for its promotions business. Live Nation personnel justified the counterintuitive economics for these transactions by looking at the long-term benefits: reducing competition for artists, including by "keeping the [artist] guarantees down" and stopping competitors from "driving the price up" for artists.

169.    Live Nation's acquisitions have, over time, constrained artists' choice of promoters. This is especially true for nationwide tours and has the effect of further increasing venues' dependence on Live Nation for content. As a major venue in New York City recognized, Live Nation has made significant acquisitions of top independent promoters over the past decade, eliminating most mid-tier promoters and leaving primarily small, concert promotion companies with little market share.

### III.    ANTICOMPETITIVE EFFECTS AND COMPETITIVE HARM

170.    Live Nation has engaged in individual anticompetitive acts that have themselves harmed competition. But those individual acts have also had the desired effect of working together in a mutually reinforcing manner to enhance Live Nation's flywheel, suffocate competition, and inhibit the evolution of the live music industry that competition could and should usher in. Live Nation (and its subsidiaries like Ticketmaster) has inserted itself into nearly every corner of the live music industry, which inures to the benefit of Live Nation, but comes at a real cost to fans, artists, venues, and to the competitive process more broadly. Live Nation's conduct, taken individually and collectively, has complicated and exploited the relationship between artists and fans for the delivery of live entertainment and increased its bottom line.

171.    The anticompetitive effects of Live Nation's distortion of the competitive process cascade through a number of interrelated relevant antitrust markets and fall upon the various entities within those markets. Live Nation's anticompetitive actions allow Live Nation to impose costs and take more for itself,

obstruct innovation, impede competitors and nascent threats, and maintain its monopolies and power.

172.   Because the competitive process has systematically and intentionally been corrupted, there has been less competition than there otherwise would have been in the live music industry over a variety of dimensions, including, ticketing fees, contractual terms, output, quality, and innovation. For example, due to Live Nation's competitive conduct:

a.   Fans have paid more in fees that are not transparent, not negotiable, and cannot be comparison-shopped because there are no other options;

b.   Fans have been denied access to the benefits a competitive process would deliver, such as more choices in concerts and innovative fan-friendly ticketing options;

c.   Artists have had fewer opportunities to play concerts, and fewer real choices for promoting their concerts, selling tickets to their own shows, and performing at certain venues; and

d.   Venues have fewer real choices for obtaining concerts and ticketing services, and many are reluctant to disrupt the status quo due to the financial risk.

173.   Live Nation has used its unlawfully maintained power in promotions, large amphitheaters, and ticketing to siphon an inflated portion of the money flows from the concert ecosystems and impose additional costs through a web of overlapping agreements with other industry participants. For example, Live Nation's "take rate"—the sum of the various cuts of fees and payments it takes through contracts across the concert industry—as the dominant intermediary is higher than it would be in a marketplace without Live Nation's anticompetitive scheme.

174.   Through interconnected agreements associated with Live Nation's various roles as ticketer, promoter, artist manager, and venue owner, Live Nation has created a feedback loop that pushes ticketing and ancillary fees higher while

allowing Live Nation to be on all sides of numerous transactions and thereby double-dip from the pockets of fans, artists, and venues.

175.   Likewise, Live Nation's role as gatekeeper for the venues it owns or controls, especially large amphitheaters, means that touring artists who intend to play several concerts in large amphitheaters are effectively forced to hire Live Nation, or face reduced compensation and access to fans.

176.   Rival promoters are unable to promote artists at many in-demand venues, hampering their ability to compete against Live Nation. And fans attending concerts at Live Nation-controlled amphitheaters get access to fewer shows and see fewer artists than they otherwise would because only Live Nation-promoted artists are allowed to perform there.

177.   In many instances, these same fans also face higher prices for ticketing and ancillary services, because Live Nation, acting as the primary ticketer, promoter, and venue owner, faces little competition in each of these interconnected markets. On the other hand, fans who live near the few remaining amphitheaters owned and booked by third parties may not have access to Live Nation's stable of artists, who are instead routed disproportionately through Live Nation's venues.

178.   Live Nation has created and now protects a system that inhibits artists, fans, and venues from making choices that should exist in a free market, whether that is choosing a concert promoter or a primary ticketer. And by locking venues into its business model, Live Nation has also dampened competition that otherwise would push fees down for fans. As a result, market forces that ordinarily would constrain the fees borne by fans are absent.

179.   Each aspect of Live Nation's scheme erects barriers for rivals and nascent threats to compete on the merits in the alleged markets with better, lower-priced, or different

180.   This scheme also cements an industry structure that requires would-be competitors to enter multiple markets simultaneously and at scale to compete effectively, further increasing entry barriers. Without Live Nation's exclusionary

TRIDENT  COMPLAINT

conduct, rivals and nascent threats could bring more innovations to the marketplace, develop important scale to improve offerings, further enhance their competitive reputation, increase investments, create disruptive business models, or expand. If those rivals and nascent threats were able to compete on a level playing field, the entire ecosystem, including artists, venues, fans, and others, would realize the many benefits of competition.

181.    Based on Live Nation's conduct, venues reasonably fear the disruption, retaliation, and complications of partnering with anyone other t

182.    Live Nation lest they lose access to culturally significant and lucrative concerts. That has predictably raised rivals' costs. For example, it has forced at least one ticketing rival to agree to venues "make good" or "lost event guarantee" clauses in some of its ticketing contracts if those venues choose that rival and Live Nation, as predicted, retaliates.

183.    These clauses obligate the rival ticketer to compensate its venue customer if Live Nation diverts or pulls concerts in response to a venue choosing a rival ticketer over Ticketmaster. In other words, Live Nation's conduct not only constrains which ticketer venues may choose, but also inhibits and raises costs for rival ticketers who try to compete with Ticketmaster.

184.    Competition on the merits would enable more innovation and better products. For example, rivals might bring fan-focused innovations to the marketplace, such as a more streamlined user interface and purchase flow, insightful presentation of ticket inventory, enhanced buying options, or more flexible refund policies. Instead, those would-be rivals face artificial barriers obstructing their ability to gain traction in the marketplace, which in turn dampens incentives to innovate.

185.    Live Nation's conduct and power also lessens the competitive pressure to innovate to improve its own products, platforms, and services. Concerns about Ticketmaster's ticketing technology are widespread and have made national news. Facing limited competitive pressure, Ticketmaster has less incentive to invest more

into proactively improving its ticketing products.. Live Nation instead uses the capital it might otherwise spend on technological improvements to sweeten ticketing contracts for venues to keep them locked into long-term exclusive agreements and out of the hands of rivals.

## IV.    RELEVANT MARKETS AND MONOPOLY POWER

186.    Courts define a relevant product and geographic market to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services, and markets need not have precise metes and bounds. A relevant market also may include distinct groups or clusters of customers or sellers, where those customers or sellers are identifiable and particularly susceptible to anticompetitive conduct by a monopolist or others.

187.    Additionally, there may exist within a relevant product market a nested sub- market that itself constitutes a relevant antitrust market. Such a market may be defined based on differences in products or services within the broader market or differences in the competitive conditions faced by various customer groups within the broader market. Where such a submarket exists, it may be helpful to also examine the effects of anticompetitive conduct within these relevant markets, as the effects may be particularly acute or significant. Additionally, there may be related markets adjacent to each other within an industry that offer distinct products and services, potentially to distinct customers, where competitive dynamics within one market impact competition within the other.

188.    Live Nation has its tentacles in virtually every aspect of the live entertainment industry. As a result, Live Nation's conduct has harmed artists, venues, and fans through the loss of competition in several relevant antitrust markets related to ticketing and promotions. Practical indicia in the industry, the structure of the industry and behavior of market participants, along with substantial evidence that includes ordinary course documents, economic analysis, and other evidence support the relevant markets identified below:

A.    <u>Ticketing Services</u>

1)    Primary Ticketing Services Markets – Primary ticketing providers offer a variety of services to two distinct sets of customers: major concert venues and fans. The particular products and services offered to and the competitive conditions faced by these two customer groups are distinct but related.

2)    With respect to venues, there is a relevant market for the provision of primary ticketing services to major concert venues in the United States ("primary ticketing services market"). This market includes within it a relevant submarket, which is in and of itself a relevant market, for the provision of primary concert ticketing services to major concert venues in the United States ("primary concert ticketing services market").

3)    With respect to fans, there is a relevant market for primary concert ticketing offerings to fans at major concert venues in the United States ("fan-facing primary ticketing market"), and there is a relevant market that includes both primary concert ticketing offerings and services that offer resale of concert tickets ("fan-facing ticketing market").

B.    <u>Concert Promotion Services</u>

1)    Concert Promotions Services Markets – Concert promoters similarly offer a variety of services to two distinct sets of customers: major concert venues and artists. The particular products and services offered to and the competitive conditions faced by these two customer groups are distinct but related.

2)    First, with respect to venues, there is a relevant market for the provision of concert booking and promotional services to major concert venues in the United States ("venue booking and promotion services").

3)    Second, with respect to artists, there is a relevant market for the provision of promotional services to artists performing in major concert venues in the United States ("artists promotions market").

4)    Artist Use of Large Amphitheaters – Owners, operators, and exclusive bookers of large amphitheaters offer artists use of large amphitheaters for their

shows. The provision of the use of large amphitheaters and ancillary services to artists for large amphitheater tours is a relevant market ("use of amphitheaters market").

189.  Even where Live Nation's anticompetitive conduct appears to affect a single relevant market, its effects on fans, artists, venues, and others directly reverberate across the live entertainment industry. Likewise, due to the anticompetitive scheme's overall effect of maintaining Live Nation's market power and monopolies and the self-reinforcing aspects of Live Nation's flywheel, effects are felt across the ecosystem regardless of the market in which any particular anticompetitive act has the most direct impact.

## V.    PRIMARY TICKETING SERVICES MARKETS

190.  Primary ticketing providers offer venues and fans a variety of related but distinct services. Primary ticketing services allow a venue to sell, track, and distribute some or all of the tickets for a show. From the fan perspective, primary ticketing services allow fans to purchase tickets for a show when it first goes on sale to the public and provide a bundle of services that handle payment processing and customer service. Often in today's market, contracts between primary ticketing services and venues dictate the terms and conditions on which primary ticketers are able to offer tickets to fans, directly impacting (and often limiting) competition for these services from the fan perspective.

### a)  Primary Ticketing Services to Major Concert Venues

191.  The provision of primary ticketing services to major concert venues is a relevant product market. Primary ticketing services are sold to venues, the customers for these services. Primary ticketers contract with venues to provide an array of services. This array of services includes the initial (or primary) sale and distribution of tickets for events at the operative venue, underlying technology, and various business support functions. Primary ticketers for major concert venues require, among other things, sophisticated software capable of handling complex

ticketing arrangements and high-demand on-sales, back-office support functions, and consumer data for marketing.

192.   In addition, primary ticketers for major concert venues that also host sporting events often must provide support for distributing a team's season tickets. The choice of primary ticketer is a key decision for major concert venues because ticketing operations can materially impact the fan experience at, and reputation of, the venue.

193.   The venues most directly impacted by Live Nation's scheme are major concert venues. These are venues big enough to host major concerts and able to provide a suitable environment and infrastructure for widely attended concerts, like large arenas and amphitheaters. As a result, major concert venues are popular locations for concerts and generate a substantial portion of their revenue from them.

194.   Because primary ticketers individually negotiate with venues over pricing and other terms, primary ticketers take into account venue size and how important concert ticketing is to a given venue when submitting a bid. Because major concert venues are particularly susceptible to the effects of Live Nation's conduct, and can be targeted, they are appropriately considered together in evaluating that conduct. Internal documents indicate that Ticketmaster monitors different categories of venues to inform its business decisions and individual negotiations, including size of venue and importance of concert revenues to the venue.

195.   The United States is a relevant geographic market for the provision of primary ticketing services to major concert venues. Major concert venues in the United States require providers of primary ticketing services capable of fulfilling contractual requirements within the United States. Internal Ticketmaster documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

196.   There are no reasonable substitutes for primary ticketing services to major concert venues, nor is arbitrage reasonably possible. Given the significant investment and technology required to build and maintain a primary ticketing service, self-supply is a not a reasonable substitute for most major concert venues.

197.   Additionally, secondary ticketing services are not reasonable substitutes. First, the intended purpose of secondary ticketing services is different than for primary ticketing services. Whereas primary ticketing services are meant to facilitate and run ticket sales on a venue's behalf, secondary ticketing services are meant to facilitate ticket purchasers' resale of their ticket(s). Second, ticketholders and fans—not venues—are ticketers' typical customers on the secondary ticketing platform. Third, the platforms for primary and secondary ticketing services are functionally very different. Internal Ticketmaster documents recognize these kinds of differences by, for example, analyzing the performance and competitive conditions of primary ticketing separately from secondary ticketing.

198.   For these and other reasons, a monopolist in primary ticketing services to major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

199.   Live Nation—through Ticketmaster—has a durable monopoly in primary ticketing services for major concert venues in the United States. For example, in 2022, Ticketmaster accounted for at least 70% of the total face value associated with all tickets sold at large arenas and amphitheaters. No other rival ticketed more than 14%.

200.   Live Nation's monopoly power in primary ticketing for major concert venues in the United States also is demonstrated by its ability to control prices and/or exclude competition. For example, in the United States, where Ticketmaster has a higher market share relative to other markets, Ticketmaster is able to charge higher prices and impose higher fees not tied to higher costs. In addition, Live Nation has the ability to exclude competition. Some examples of its power and

TRIDENT  COMPLAINT

scheme are described above, such as successfully threatening and retaliating against venues that consider a rival primary ticketer and imposing various other restrictive contractual terms.

201.   Live Nation's primary ticketing services monopoly for major concert venues in the United States is also protected by significant barriers to entry and expansion. Successfully building primary ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing.

202.   Live Nation uses its monopoly power in concert promotions to foreclose competition in primary ticketing and erects additional barriers to entry, which prevent ticketers who are not vertically integrated from competing on a level playing field. Live Nation's agreements and exclusionary conduct act as further barriers to entry because they impede rivals' ability and incentives to compete.

203.   Within this market exists a narrower relevant product market for the provision of primary ticketing services for concerts and comedy events ("concerts") to major concert venues. There are some unique attributes to providing primary ticketing services for concerts to major concert venues such that there are no reasonable substitutes, nor is arbitrage possible. For example, some primary ticketing features are particularly important for concerts, including the ability to handle complex on-sale processes, surge traffic, and specific types of marketing initiatives.

204.   In addition, financial arrangements contracting, and fees charged to fans for primary ticketing services can differ for concerts as compared to other event types like sports. This is due, at least in part, to how lucrative hosting concerts can be for major concert venues. Thus, viable competitive alternatives for primary ticketing services for concerts at major concert venues can be, and are, different than for other live events. Internal Live Nation documents analyze concert

ticketing separately from ticketing for other events and identify venues for which concert revenues are particularly important.

205. Live Nation—through Ticketmaster—has a durable monopoly in primary concert ticketing services for major concert venues in the United States. For example, Ticketmaster accounts for at least 80% of the total face value associated with all concert tickets sold at major concert venues.

206. For the same reasons as stated above, there are substantial barriers to entry and expansion within this narrower market. A monopolist in primary concert ticketing services at 13 Live music concerts and comedy shows (as well as musical artists and comedians) have competitive similarities in terms of tour planning, on-sale events, and venue suitability. Ordinary course evidence suggests that concerts and comedy events are assessed and treated similarly as a matter of industry practice major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

**b) Primary Concert Ticketing Offerings to Fans at Major Concert Venues**

207. The provision of primary concert ticketing offerings to fans at major concert venues is a relevant product market. Fans rely upon primary concert ticketing offerings to purchase tickets to concerts. Primary ticketers typically provide an online interface to purchase tickets to a concert during an initial on-sale and continue to offer tickets for sale until the show is sold out. In addition to facilitating the purchase of tickets, primary concert ticketing offerings typically also provide customer service to fans, employ mechanisms to detect and prevent fraudulent purchases, store credit card information, keep track of fan purchases, and provide fans other related services.

208. Primary concert ticketing offerings to fans at major concert venues require, among other things, sophisticated software capable of handling complex ticketing arrangements and high-demand on-sales and databases. Currently in the

United States, except in rare cases, only a single primary ticketing service is offered to fans to purchase tickets to a given concert, and typically, only one primary ticketing service is offered to fans to purchase tickets during all on-sales for a given venue.

209.   Resale services offer a different service: the resale of previously purchased tickets. Thus, in order for a ticket to be available for resale on a secondary ticketing marketplace, the ticket must have already been purchased from a primary ticketing offering, with the purchaser having already paid the fees associated with the primary ticketing offering. Accordingly, the fees (and often ticket prices) associated with resale marketplaces are not closely related to the fees associated with primary ticketing offerings, because primary ticketing fees are baked into the price of tickets being resold on these marketplaces.

210.   Likewise, other means of obtaining tickets during an initial on-sale are limited and not available to all fans. Ticketmaster makes available a limited number of tickets to ticket brokers but charges fees for the initial transfer of tickets to these brokers before those tickets can be resold to fans. Ticketmaster also allows for the limited ticket sales to artist fan clubs in some circumstances, but such ticket sales are limited in number and not all fans are eligible to purchase tickets through these channels. As a result, they do not represent reasonably close substitutes for most fans today, although they could in the future but for Ticketmaster's anticompetitive conduct.

211.   In addition, fans may not view primary and resale tickets as close substitutes due to a perception that a primary ticket purchase is more "secure" or "guaranteed" as compared to a resale purchase.

212.   Internal documents indicate that Live Nation tracks its share of primary concert ticketing separately from its share of resale ticketing and identifies a distinct set of competitors in each segment. Live Nation also monitors its share of concert ticketing separate from its share of ticketing for other types of shows.

213.   The United States is a relevant geographic market for primary concert ticketing offerings for fans. Fans seeking to attend shows in the United States must use primary concert ticketing services that offer tickets for those shows. Internal Live Nation documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

214.   For these and other reasons, and consistent with industry information, a monopolist in primary concert ticketing offerings to fans at major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

215.   Live Nation—through Ticketmaster—has a durable monopoly in primary concert ticketing offerings to fans at major concert venues in the United States. For example, in 2022 Ticketmaster accounted for at least 80% of the total face value associated with all concert tickets sold at major concert venues.

216.   Ticketmaster's monopoly power in primary concert ticketing offerings to fans at major concert venues in the United States is further demonstrated by its ability to control prices and/or exclude competition. In the United States, where Live Nation maintains a high market share in arenas and amphitheaters through its exclusive contracts and owned and operated venues.

217.   Ticketmaster has much higher fees relative to other countries notwithstanding comparable costs. In addition, Live Nation has the ability to exclude competition by insisting that venues utilize only Ticketmaster for all shows and for all tickets sold for a given show.

218.   Live Nation's monopoly in primary concert ticketing offering to fans is also protected by significant barriers to entry and expansion. To successfully build primary concert ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing.

TRIDENT  COMPLAINT

219.    Live Nation uses its market power in concert promotions to foreclose competition for primary ticketing service for fans, while also erecting additional barriers to entry that prevent, by preventing ticketers who are not vertically integrated from competing on a level playing field. Live Nation's agreements and exclusionary conduct act as further barriers to entry because they impede rivals' ability and incentives to compete.

220.    Although the provision of primary concert ticketing services to fans is a relevant product market, in the alternative, there is also a broader relevant product market that includes both primary concert ticketing offerings and services that provide resale for concert tickets to fans at major concert venues. For the reasons above, primary concert ticketing offerings to fans offer distinct services from resale service providers, and resale marketplaces necessarily rely upon an initial sale of a ticket via a primary concert ticketing service (inclusive of the primary ticketing fees) in order for the resale marketplace to exist.

221.    Nonetheless, a fan looking to purchase a concert ticket may be able to purchase such a ticket from a primary ticketing offering or resale service provider. To the extent the two markets are combined into a larger market, internal documents show that Live Nation has substantial market power or monopoly power in this broader market as well.

222.    The United States is a relevant geographic market for concert ticketing offerings and resale services for fans. Fans seeking to attend concerts in the United States must use ticketing services that offer tickets for those shows. Internal Live Nation documents support the United States as a relevant geographic market. For example, Live Nation evaluates the business and competitive conditions in segments within the United States separately from Canada.

223.    For these and other reasons, and consistent with industry information, a monopolist in a combined market of primary concert ticketing offerings and services that provide resale of concert tickets to fans for shows in the United States

would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

224.   Live Nation—through Ticketmaster—has a monopoly in this market. For example, in 2022, Ticketmaster accounted for more than 70% of the total transactions associated with all tickets sold or resold for concerts at major concert venues in the United States. Transaction volume is an economically relevant measure of power in this market. Importantly, these numbers capture only transactions handled principally by Ticketmaster. But, as discussed above, because of Ticketmaster's use of technology like SafeTix, Ticketmaster necessitates its involvement in the resale of tickets that take place entirely on rivals' secondary ticketing platforms. In doing so, Ticketmaster is able to exert some degree of control over these transactions as well as obtain valuable fan data related to ticket transfers. As a result, Ticketmaster's share understates its competitive significance in this market.

225.   Ticketmaster's monopoly power in this market also is demonstrated by its ability to control prices and/or exclude competition. For example, Ticketmaster is able to charge higher prices in areas where its power is greatest (notwithstanding comparable costs), as evidenced by the much higher fees charged in the United States, where Ticketmaster has a high market share, relative to elsewhere where its shares are much lower. In addition, Live Nation has the ability to exclude competition. Some examples of its power and scheme are described above, such as successfully threatening and retaliating against venues that consider a rival primary ticketers and imposing various other restrictive contractual terms.

226.   Live Nation's monopoly over primary concert ticketing offerings and services that provide resale of concert tickets is also protected by significant barriers to entry and expansion. To successfully build primary ticketing capabilities requires substantial investment and access to scale. Live Nation touts its enormous scale as an advantage. Live Nation's scale and its flywheel exacerbate the barriers to entry and expansion in primary ticketing.

TRIDENT  COMPLAINT

227.   Live Nation uses its market power in concert promotions to foreclose competition to become a primary ticketing offering for fans and erects additional barriers to entry, by preventing ticketers who are not vertically integrated from competing on a level playing field. Additionally, Live Nation has taken steps to impede resale providers from efficiently facilitating the resale of tickets, including by hindering the transfer of tickets originally sold by Ticketmaster. Live Nation's agreements and exclusionary conduct act as a further barrier to entry because they impede rivals' ability and incentives to compete.

### c)  Concert Promotions Services Markets

228.   Concert promoters offer a variety of related products and services to two distinct sets of customers: major concert venues and artists. For major concert venues, promoters arrange for, book, and market shows with artists to fill available dates at the venues. These services can take the form of booking one-off performances of an artist or long-term booking agreements where the promoter promises to bring multiple artists to a venue over a period of time.

229.   For artists, concert promoters work to plan, finance, and market an artist's show or—as is more often the case—a tour of multiple shows. In this way, although concert promoters are responsible for bringing together an artist and venue to perform a show, the particular form and nature of services they offer venues and artists differ considerably.

## VI.   CONCERT VENUES

230.   The providing of concert booking and promotion services to major concert venues is a relevant antitrust product market. In general, promoters arrange and coordinate artist performances at venues and help to promote those shows to the public once they are booked. Promoters have significant influence over which venues an artist chooses to play.

231.   Typically, venues enter into individualized agreements with promoters (either on a show-by-show or long- term basis), which dictate the payments between venues and promoters in exchange for the performance(s). Concert

TRIDENT  COMPLAINT

booking and promotion services are essential to major concert venues because they help ensure the venues receive a steady stream of concert content.

232.   The venues most directly impacted by Live Nation's scheme are major concert venues such as the City's Greek Theater. As discussed above, major concert venues have unique characteristics that make it appropriate to include them in this product market. In particular, major concert venues rely on live entertainment for a significant portion of their revenues and thus are unlikely to forego promotion services. Revenue from live entertainment is important to offset substantial fixed costs at these venues, and more events allow venues to allocate those costs across a greater number of shows.

233.   There are no reasonable substitutes for the purchase of concert booking and promotion services for major concert venues. Booking and promotional services for non-concert events at major concert venues are not adequate substitutes because the venues' average revenue per show from concerts is often higher than from non-concert events. Neither self-promotion nor self-supply is a significant constraint because most venues will be unable to incentivize a sufficient number of artists to choose to perform at their venue without the support of a promoter.

234.   Most venues, including The Greek Theater, cannot successfully promote concerts at a significant scale because they lack the necessary expertise and relationships and are unwilling to assume the financial risk of a show selling poorly. Industry participants, including Live Nation and venues, recognize that providing concert promotions is a unique business and separately analyze the business and competitive conditions.

235.   The relevant geographic market for the provision of concert booking and promotion services to major concert venues is no broader than the United States, and there may also be smaller, regional relevant geographic markets. When procuring booking and promotion services, major concert venues in the United States require providers that can service their requirements in the United States.

TRIDENT  COMPLAINT

236.   Further, many artists who perform at major concert venues do so as a part of regional or national tours that include venues across the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and separately evaluates the business and competitive conditions in the United States.

237.   For these and other reasons, a monopolist in the provision of concert booking and promotion services to major concert venues in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

238.   Live Nation has monopoly power in the provision of concert booking and promotion services to major concert venues in the United States. For example, Live Nation as a promoter accounts for around 60% of the total face value associated with all primary tickets sold at major concert venues and more than 70% of the total face value associated with large amphitheater shows in the United States. Total face value is an economically relevant measure of power in this market. As another point of reference, Live Nation is reported to have promoted 22 of the top 30 Billboard "boxscores" in 2023.

239.   Live Nation's monopoly power in concert booking and promotion services for major concert venues in the United States is also demonstrated by its ability to control prices and exclude competition. For example, as described above, Live Nation extracts supra-competitive payments from venues, including large promoter rebates, and otherwise imposes onerous, restrictive contractual terms on venues in exchange for supplying them with content. In addition, Live Nation has the ability to exclude competition in concert promotions through, for example, exclusivity agreements with venues. Some examples of its power and scheme are described above, including using its power to stop rivals or nascent threats from competition in concert promotions.

240.   Live Nation's power over concert booking and promotion services is protected by barriers to entry and expansion. Promotion contracts with artists, the key input in this market, requires capital, expertise, connections, data, and a demonstrated level of success in the industry. There are also indirect network effects that sustain high barriers to entry in concert promotions. Venues naturally prefer to work with a promoter who is successful in promoting many popular artists, and artists naturally prefer to work with a promoter who is successful in promoting many high-demand shows at popular venues. As described above, in addition to Live Nation's scheme, Live Nation's self-described flywheel and scale-related factors enhance substantial barriers for entry and expansion in this market as well.

## VII.   PROMOTION SERVICES TO ARTISTS

241.   The provision of promotion services to artists performing in major concert venues is also a relevant product market. Artists seek to contract with promoters for their help in arranging individual concerts and tours. Typically, artists enter into contracts with a promoter for a single show, multiple shows, including a tour. Promoters work with artists, and their managers and/or agents, to help the artist choose the venue(s) where they will play, work with venues on behalf of the artist to arrange aspects of the show(s), and then ultimately promote each show in local areas where the artist will perform.

242.   Promoters take on the financial risk associated with a show or tour, and in exchange they are compensated with a portion of the revenue generated by successful shows. For artists seeking to perform in major concert venues, promoters are an essential component to ensuring the show or tour is successful.

243.   Artists who seek to perform all or parts of their tour in large amphitheaters are uniquely impacted by Live Nation's anticompetitive conduct. Because of Live Nation's control over a vast network of large amphitheaters and its policy to only work with artists that it promotes, artists seeking to perform a tour in large amphitheaters are denied the ability to work with the promoter of their choice

if they want to play a Live Nation-owned or controlled venue. These artists are forced either to work with Live Nation or forgo an amphitheater tour altogether.

244.   There are no reasonable substitutes for promotion services for artists seeking to perform in major concert venues. Artist performances in major concert venues are complicated events whose success requires significant industry experience and relationships with different vendors. Self-promotion is not a reasonable substitute for artists because they generally lack the expertise, relationships, and financial resources to promote a show or tour on their own at major concert venues.

245.   The relevant geographic market for the artist promotions market is no broader than the United States, and there may also be smaller, regional relevant geographic markets as well. When procuring promotion services for performances in major concert venues in the United States, artists require promoters who can service their requirements in the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and evaluates the business and competitive conditions in the United States separately.

246.   For these and other reasons, and consistent with industry information, a monopolist in the artist promotions market in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

247.   Live Nation currently has monopoly power in the market for the provision of promotion services to artists performing in major concert venues in the United States. Live Nation's policy of blocking third-party promoted artists from using its amphitheaters has enabled the company to grow its share in the artists promotions market, above and beyond what it would have been able to achieve through fair competition.

248.   Industry participants, including venue owners, recognize Live Nation's dominance in this market. As one prior venue manager explained, "If you don't do

TRIDENT  COMPLAINT

a deal with these guys, you're going to lose shows." Live Nation as a promoter accounts for around 60% of the total face value associated with all primary tickets sold at major concert venues and more than 70% of the total face value associated with large amphitheater shows in the United States.

249.   Live Nation's power over the artist promotion services market is protected by barriers to entry and expansion.

## VIII.   ARTIST USE OF LARGE AMPHITHEATERS

250.   The provision of the use of large amphitheaters and ancillary services to musicians and comedians ("artists") for large amphitheater tours is also a relevant product market. "Large" amphitheaters (also known as "non-boutique amphitheaters") are recognized as a distinct type of venue in Live Nation's ordinary course documents and regular reporting and by industry participants. Large amphitheaters have unique characteristics—including capacity, sight lines, acoustics, seating, and staging—that differentiate them both from smaller amphitheaters and other venues.

251.   These unique characteristics make large amphitheaters attractive to both artists and fans in the summer months when most touring takes place, and as a result, there are artists who seek to perform several shows or even entire tours at large amphitheaters in given year. They also are attractive to artists who are not yet able to—or no longer able to—fill a larger venue, like an arena, but have outgrown smaller clubs and theaters.

252.   In a similar vein, industry participants, including Live Nation and venues, recognize that large amphitheater concerts constitute a unique business and separately analyze the business and competitive conditions.

253.   Large amphitheaters provide artists the use of their venue plus related services, such as staging and lighting, and in exchange, the artist pays rent and performs a show that enables the venue to collect additional revenue from fans, including from food, beverage and parking. Artists either work directly with their

agent, or through their chosen promoter, to communicate with venues about availability and ultimately choose the amphitheaters where they will perform.

254. The artists most impacted by Live Nation's anticompetitive conduct are those interested in performing a tour of large amphitheaters in a particular year. This includes artists seeking to perform exclusively at large amphitheaters as well as artists seeking to construct a tour that includes both a significant number of shows at large amphitheaters as well as shows at other venues.

255. Artists seeking to perform a tour of large amphitheaters will not view a tour that excludes large amphitheaters as a reasonable substitute. As described above, large amphitheaters have unique characteristics that distinguish them from other venues, and artists seeking a tour of large amphitheaters will generally not consider a tour wholly excluding large amphitheaters as a reasonable alternative. Industry participants, including Live Nation, recognize that there are artists with a specific interest in touring large amphitheaters.

256. The relevant geographic market for the use of large amphitheaters market is no broader than the United States, and there may also be smaller, regional relevant geographic markets. Artists seeking to do a large amphitheater tour often do so as part of regional or national tours across the United States. Internal Live Nation documents also support the United States as a relevant geographic market. For example, Live Nation considers the United States to be a distinct reporting segment and evaluates the business and competitive conditions in the United States separately.

257. For these and other reasons, a monopolist who controls the use of large amphitheaters in the United States would be able to maintain prices above competitive levels and/or maintain quality below the level that would prevail in a competitive market.

258. Live Nation has monopoly power in the use of large amphitheaters market. Live Nation owns, operates, or exclusively books concerts in more than 55 large amphitheaters in the United States. Live Nation's controlled venues account

TRIDENT  COMPLAINT

for at least 65% of the total number of primary tickets and face value associated with all concert tickets sold at large amphitheaters. These measures are economically relevant measures of power in this market.

259.   Live Nation's monopoly power in the use of large amphitheaters market is protected by barriers to entry and expansion. Entering this market requires significant time, capital and expertise to either build a new amphitheater or sign a contract with an existing amphitheater to operate it. Building a new large amphitheater is particularly burdensome and uncertain, as it requires a potential new entrant to identify a specific location for the facility, acquire the land, secure the necessary permitting, and contract with the many vendors necessary to put on successful shows.

260.   Large amphitheaters also require access to artists to ensure financial viability. Because Live Nation routes the artists it promotes to its own existing network of amphitheaters, that makes it more difficult for a new amphitheater to attract the talent necessary to be financially viable.

**THE GREEK THEATER**

261.   The Greek Theater ("The Greek Theater") is an open-air amphitheater, owned by the City of Los Angeles, located in Griffith Park. Since the 1930s, The Greek Theater has hosted a variety of performances, ranging from orchestral concerts, world recognized music and theatrical performances, to high school graduations. From its inception, The Greek Theater has been held out to be a place of public recreation. With the growth of the live event industry.

262.   The Greek Theater has grown in popularity and, thus, requires additional financial support beyond what the DRP can offer. As a result, The Greek Theater supports and adheres to the monopolistic policies of Live Nation, and Ticketmaster, as an attempt to enhance its revenue needs. However, this has proven to be to the detriment of The Greek Theater.

263.   The Greek Theater is owned by the City of Los Angeles and the Department of Parks and Recreation ("DPR"). Specifically, The Greek Theater is

under the direct control and management of the DPR Commissioners: Renata Simril, Luis Sanchez, Marie Lloyd, Fiona Hutton, and Benny Tran. These DPR Commissioners were appointed by Defendant Karen Bass, Mayor of Los Angeles for five-year terms.

264.    Beginning in 2015, The Greek Theater entered "a new era of public entertainment management," focused on an Open-Venue model. The Open Venue model allows artists and promoters to book directly with the venue. The Greek Theater announced this era as under the control of the City of Los Angeles, under the direction of the DPR.

265.    Despite The Greek Theater being under the direct supervision of the City's DRP Commissioners,  the management and day-to-day operations of The Greek Theater were outsourced to Defendant ASM Global Theater Management, LLC ("ASM").

266.    Plaintiff is informed, believes and alleges that The Greek Theater Management Agreement was signed between the City of  Los Angeles and an entity known as the Service Management Group, Inc. ("SMG") in 2018.  Furthermore, it was an explicit term and covenant of the 2018 Greek Theater Management Agreement that The Greek Theater was to be operated as an Open Building/Open Venue—no exclusive arrangements for ticketing, concert booking, or concert promotion were to be allowed. See Exhibit "2".

267.    Service Management Group, Inc, operated The Greek Theater until it merged with AEG to form Defendant ASM Global Theater Management in 2019.

268.    After the merger of AEG and SMG in 2019, forming ASM Global, the management and operation of The Greek Theater was shifted to SMG. The role of SMG, as a subsidiary of ASM, is to manage, operate, and book events at The Greek Theater. Plaintiff is informed and believes, and thereon alleges that  during this time frame, Defendant ASM Global entered a partnership with Defendant Live Nation and Defendant Ticketmaster to provide services to  the North American venues managed by ASM.

269.   Despite ASM's website showing it manages The Greek Theater, contracts from The Greek Theater still reflect SMG as the management company (collectively Defendant ASM/SMG). Furthermore,  despite the explicit written City Open-Venue Model policies of not allowing any exclusive arrangements for ticketing, booking, or promotion of acts booked at The Greek Theater, as described hereinabove, Defendant ASM/SMG has quietly given Defendant Ticketmaster exclusive ticketing (and implicitly exclusive marketing or promotion rights to Defendant Live Nation) for The Greek Theater.

270.   Neither The Greek Theater, Defendant ASM/SMG, nor the five Defendant Commissioners who oversee the City's Department of Recreation and Parks, who were appointed by Defendant Mayor Bass, nor Mayor Bass herself, have publicly disclosed this below the radar arrangement which violates the City's Open-Venue Model for operating The Greek Theater, a city owned venue.

271.   SMG's role with The Greek Theater focuses on coordinating and managing the booking calendar and, if requested, coordinating with artists and promoters of events.  SMG also manages and staffs the Box Office, under the direct supervision of Defendant Kristen Sten, the General Manager.  Brianna Sparks, The Greek Theater Box Office Manager, assists in coordination and management of the live productions, as well as executing terms of the Management Agreement.

## IX.   PLAINTIFF'S FRUSTERATED ATTEMPT TO PRODUCE SHOWS WITH THE GREEK THEATER WITHOUT INVOLVEMENT OF THE DEFENDANTS TICKETMASTER AND LIVE NATION

272.   In August 2023, Trident Concert Productions ("Trident") and The Kingston Trio ("Trio") entered into a Tentative Agreement with The Greek Theater/SMG for the performance and recording of The Kingston Trio at The Greek Theater on the 17th and 18th of August 2024 ("the Shows"). Trident and the Trio's intent was to produce a documentary concert film and a high-quality live concert album ("Recording Products) to accompany the film. This concert was

contracted with and to be distributed by BRI for worldwide distribution in theatres, television, and streaming.

273.   To place a hold on The Greek Theater calendar, an applicant must provide the headlining act name and date of performance to be placed in the first available hold position. An applicant in the first hold position cannot be challenged if the minimum rent deposit has been received. Users may reserve multiple days on the calendar for one artist by providing a deposit of twenty-five thousand dollars ($25,000.00) per performance day. Trident paid fifty thousand dollars ($50,000.00) to secure the filming and performance dates for Saturday August 17, 2024, and Sunday August 18, 2024, respectively.

274.   The User Agreement was fully executed on or about January 17, 2024. 2024.  See Exhibit "3"  attached hereto.

275.   Between February and July of 2024, The Greek Theater repeatedly stated in face-to-face meetings, in writing and by phone, to Trident that in house promotion through The Greek Theater's 420,000 email subscribers would take place each week. The Greek Theater sends these concert updates to their customer email list to promote upcoming concerts and events at the venue.

276.   The Greek Theater also informed Trident that the Kingston Trio's Celebration of Folk Music performance would be promoted on the on-site calendar billboard jumbotron, of which two flank the main stage and present up-coming attractions. In addition to the on-site billboard jumbotron, the Shows would be promoted on the main jumbotron on the street outside of The Greek Theater. On March 1, 2024, The Greek Theater conveyed additional terms of the Agreement in part by communicating with Trident via email to obtain the specifications for the Trio's logo to place on the in-house jumbotron promotion.

277.   As part of their effort to promote the concert professionally, Trident and the Trio spent approximately two hundred thousand dollars ($200,000) in advertisements on radio, television, social media, newspaper advertisements,

and freeway billboards. Additionally, the Trio participated in at least three televised interviews with local television news stations.

278.   Shortly after the execution of the Agreement, Trident requested that The Greek Theater utilize Eventbrite as the main ticketing vendor. In response, the Box Office Manager, Brianna Sparks, stated that The Greek Theater was *an exclusive* Ticketmaster house, and thus, Ticketmaster was the exclusive vendor for Celebration Concerts.

279.   At the time of execution of the Agreement in January 2024, Trident was completely unaware of such policy as the terms of the Agreement did not specify an exclusive vendor or indicate that Ticketmaster was the intended vendor for events at The Greek Theater. Trident believed they were renting directly from The Greek Theater, not a proxy for Live Nation and Ticketmaster.

280.   Trident also expressed concern directly to Brianna Sparks that there was concern over the ability for the Trios fans to easily purchase tickets. Trident informed The Greek Theater that most Trio fans were "elderly", in the 55+ age group. The Greek Theater never acknowledged at any point that there might be difficulty with the Trio's demographics and their ability to obtain/buy or secure tickets based on Ticketmaster's difficult and at times impossible undisclosed methods of selling tickets.

281.   After having produced over 50 concerts, Trident reasonably requested again in March 2024 to use Eventbrite ticket sales. Trident was told again by Brianna Sparks that Ticketmaster was the only ticket sales vendor The Greek Theater would allow and using Eventbrite as the ticket sales vendor for this show would be unacceptable.

*282.*   Nevertheless, Greek Theater staff told Trident representatives that the Greek Theater would do an all- out in house marketing/advertising/promotion campaign commensurate with their standard in-house campaigns for any other show that was part of the Greek Theater's summer line-up of concerts. Greek Theater staff members, Brianna Sparks, Daniela Romero, working under the direct

supervision of Defendant Sten promised in emails the following marketing campaign:

> *For marketing we will do the following:*
>
> *Email Blast on Wednesday morning!*
>
> *Social Media Post Day of the Announcement*
>
> *Update our Digital Marquee Week Of*
>
> *Add Information to our Website/Ticket Link*
>
> *Website:*
>
> *Image sizes needed (most shows use artist photo; some use admat):*
>
> *1300x620 + 760x600 (jpg under 999 kb)*
>
> *Info for Website:*
>
> *Presenter name:  PAUL MITCHELL*
>
> *Show billing: THE KINGSTON TRIO and THE LIMELITERS*
>
> *Support (if any): The John Stewart Band, The Hot Licks, Cynthia Sayers*
>
> *Show date: Saturday and Sunday August 17 and 18, 2024*
>
> *Show time: 7PM*
>
> *Door time: 5:30 PM*
>
> *Announce date & time: MARCH 5, 2024*
>
> *Presale date & time (if any): N/A*
>
> *On Sale date & time: 10:00 AM March 7, 2024*
>
> *Ticket price range: $40-$149*
>
> *Ticket link: Ticketmaster and Kingstontrio.com*
>
> *Age Restrictions (if any): NONE*
>
> *Pit type: seated or standing. SEATING*
>
> *Show info/description: optional; most shows do not have one! AN EVENING OF AMERICAN ACOUSTIC*

283.    Additionally, Ms. Sparks and Ms. Romero also provided specifications for artwork that was to be incorporated into the Greek Theater's two inhouse

Jumbotrons, the Greek Theater website and incorporated into the various social media outlets traditionally used by the Greek Theater, including Instagram and Facebook.

284.   Greek Theater staff members Brianna Sparks and Daniella Romero also assured Trident that the email blasts would be sent to the Greek Theater mailing list consisting of over 420,000 people (the Master Mailing List).  Ms. Sparks assured Trident representatives in early March 2024, before tickets went on sale, that at least 3-4 email blasts to the Greek Theater Master Mailing List would take place before August 1, 2024.  Ms. Sparks also assured Trident representatives that the Trio Concerts would be part of regular Greek Theater internal marketing (Jumbotrons, website, Instagram, and other social media) of upcoming events starting after tickets went on sale on March 6, 2024.

285.   After tickets went on sale in spring of 2024, the Trio's typical elderly fan attempting to purchase tickets for the concert encountered several difficulties. First, The Greek Theater's website incorrectly conveyed the message that the concerts were sold out, when in fact the opposite was the case. Upon casual observation of the website, every seat for both nights appeared sold.

286.   Second, any prospective ticket buyer who typed www.greektheatre.com was directed to faulty URLs that led to dead landing pages, eclectic advertisements, or Go Daddy Buy this Site pages which failed to redirect users to the proper website, lagreektheatre.com. Many prospective ticket buyers unaware of the proper website gave up the effort.

287.   Third, individuals who did not possess an iPhone or smartphone and who had not downloaded the required Ticketmaster application were unable to purchase tickets through Ticketmaster. Due to the Trio's fanbase's typical age and limited familiarity with complex online ticketing platforms, they were unaware of Ticketmaster's web-based purchasing system, which greatly inhibited fans from purchasing tickets.

TRIDENT  COMPLAINT

288.   The Greek Theater failed to notify fans that tickets could be purchased through Ticketmaster's online platform. *Ticketmaster has a policy requiring users to download the App before a ticket can be purchased. Ticketmaster also at times requires two separate apps in order to purchase a ticket. Ticketmaster's policy requires the use of a Smartphone to accomplish all of the above.* In some cases, Ticketmaster indicated online that in order to purchase a ticket the buyer must purchase a $1,000 iPhone (smartphone) and/or download a Ticketmaster cellphone application (the "App").

289.   Trio fans were told by The Greek Theater and Ticketmaster that ticket sales through phone calls or in person at the box office were not allowed. Despite assertions by Ticketmaster and The Greek Theater that tickets could only be purchased via a Ticketmaster cell phone application or iPhone, or smartphone, documentation provided by The Greek Theater, after the August 17-18, 2024 concerts by the Kingston Trio proved that paper tickets were available for sale at the box office or by telephone both prior to and on the day of the concerts.

290.   However, no options for the easy/convenient purchase of tickets were ever made publicly known. In fact, many fans have subsequently confirmed this difficulty, reporting spending many hours trying to navigate the internet to purchase tickets. Further, many fans reported that they gave up on trying to get tickets.

291.   Many Senior Citizens tried accessing the website address of www.greektheater.com but were directed to a blank landing page. If

292.   Furthermore, the Kingston Trio has performed numerous sold-out shows in venues ranging from 800 to 2,500 seats throughout the United States and a largely empty Greek Theater venue is not characteristic of a Kingston Trio performance.

293.   Despite The Greek Theater's knowledge of Ticketmaster's typical business practices, offering its ticketing online and through smart phones, The Greek Theater failed to avail the Trio's audience, who are mostly Senior Citizens, to alternative means by which tickets could be purchased.  In doing so, Trident was

unable to insert this factor into their advertising campaign and thus could not inform their audience of the possible complications in purchasing a ticket through Ticketmaster. The Greek Theater later revealed that physical tickets were available for purchase over the phone and in person at the box office.

294.   The User Agreement also included unalterable provisions regarding the Audio/Visual ("AV") recordings required to produce The Trio's LIVE DOUBLE ALBUM. This provision was essential to the purpose of The Trio's entire Show production. SMG/The Greek Theater worked with a third-party vendor, Sweetwater, for the AV productions. Only after Trident "paid in" and was fully financially committed to the project were they informed directly that The Greek Theater used third-party vendor Sweetwater for filming and that Trident using their own film crew would be intrusive and unnecessary since The Greek Theater's in house producers were allegedly State of the Art and operated by "A" list union operators, both on camera and on the switchboard.

295.   In preparation for the Show, Trident requested three location walkthroughs in advance of the concerts. One of its requests included a technical walkthrough (with a location scout) which is necessary and routine for the motion picture department heads to fully determine what production needs are required. Trident was offered a singular walkthrough on August 1, 2024.

296.   During this walkthrough, Trident was informed by Paul Snell, the assistant general manager for The Greek Theater, that the Shows **were not a part of** The Greek Theater's regular programming, and thus, not eligible for the standard promotion, marketing and advertising usually provided with access to the Greek Theater's email subscriber list of over 420,000 subscribers or previous patrons, and access to the in-house jumbotron promotion of upcoming attractions. This information was delivered in complete conflict with both written and oral assurances of Brianna Sparks and Daniella Romero communicated to Trident in March and April of 2024, several months in advance of the August Concerts.

297.   It was not until August 1, 2024, that Trident was made aware that rental of The Greek Theater for these Shows was in any matter different from other promoters such as Live Nation/Ticketmaster, AXS, or Nederlander.

298.   When asked why the Trident Shows were not a part of The Greek Theaters regular programming, Snell offered no reasonable explanation except to say, "That's what I was told." Snell's statements were in direct conflict with written promises by Brianna Sparks, The Greek Theater's Box Office Manager, and was the first indication that The Greek Theater was in fact conspiring and working against any chance of success for the Shows.

299.   With the Shows approaching, Trident requested a technical walkthrough necessary to survey the layout of the transmission lines, satellite link, and access the AV to ensure the appropriate mobile cameras to produce the motion picture. On August 10, 2024, Trident was offered a limited walkthrough.

300.   Trident was denied access to the AV switching facility during the walkthrough, which was necessary to establish any technical problems that might arise during production and ensure the success of the motion picture.

301.   Not only was Trident forbidden access to the AV facility, but any visual inspection view of the AV facility was physically blocked by The Greek Theater management's placement of a large canvas tarp acting as a wall. Accordingly, Trident was repeatedly denied an accurate survey and assessment of TV monitors, switchboard, camera quality, or anything deemed important to the professional recording of imagery or sound for the Shows and live album.

302.   Trident had made it clear to Paul Snell and Kristen Sten that access to the AV facility and cage would be necessary to ensure the necessary equipment was present for the sound and video filming of the concert. This access was denied. Trident was later informed that the AV facilities were managed and operated by a third party, NEP Sweetwater.

303.   However, Sweetwater informed Trident that their work was at the directive of SMG and The Greek Theater. Communications between The Greek

TRIDENT  COMPLAINT

Theater and Sweetwater appeared intact as Trident continued to be denied access to the AV facilities. Trident had no choice but to rely on Sweetwater's representations of having an experienced team assigned to the Greek Theater to get the Kingston Trio through the two nights shooting.

304.   In addition to Trident's film director, Nick Cassavetes, two individuals from Sweetwater were present each night of the concerts to perform the tasks of switching camera views, operating robotic cameras and managing sound recording.

305.   However, the actual show was directed in professional manner with an "A" list director, (Nick Cassavetes) an award-winning sound mixer (Mikael Stewart), and several highly skilled production personal. Mikael Stewart transmitted the show's sound from his sound booth position on the floor of The Greek Theater in full dimensional stereo to the Sweetwater AV cage, located several levels below the sound booth.  However, for some inexplicable reason the Sweetwater team working in the AV cage, reduced the sound tracks into sub-standard monaural, an audio quality level that made it impossible to create a live stereo album.

306.   During the first show, on the evening of August 17, 2024, the Trio's entire Saturday show, critical to the ultimate success of Sunday's show, and the entire project was not recorded. Not a single second of Saturday's performances was saved to any hard drives provided by Plaintiff Trident . Thus, without both nights being recorded, subsequent Trio projects dependent on the  two nights of filming and recording were rendered null and void. Without having full and complete recordings and filming of both nights of concerts, the anticipated and discussed documentary film, mentioned in contracts and documents exchanged with Greek Theater management was wiped out, as was the distribution deal to re-stream and/or broadcast the two nights of concerts later in the year. Natalie Combs, a NEP Sweetwater employee, and Edward McGinty, a live multi-camera director employed by The Greek Theater and NEP Sweetwater, were present within the AV

facility during the show to operate the cameras but said nothing about not recording nor filming the Saturday night concert.

307.   In fact, on Saturday, August 17, 2024, neither Combs nor McGinty checked to make sure that the necessary hard drives required to record the Shows were actually plugged in. This failure to perform in a professional manner of the most basic tasks I production (making sure there's "film in the camera") appears to show a conscious and reckless, if not intentional disregard  for the Agreement and for the Project.

308.   On or about August 19, 2024, Trident was informed via paper settlement and presented with a bill exceeding $200,000 more for all the filming and sound. This letter was presented to Trident before Sweetwater had an opportunity to explain what had happened. Trident received the bill for filming and 'delivering,' and then Olivia Doty of Sweetwater sent Trident a letter stating The Greek Theater never instructed Sweetwater AV to record at all. Trident was provided with the excuse that The Greek Theater management had failed to provide written instructions to Sweetwater to record the performance.

309.   This was backed up by an email sent by Olivia Doty, of Sweetwater, who stated that nobody from The Greek Theater including Kirsten Sten or Brianna Sparks instructed her to record. Nevertheless, this contradicted Ms. Doty's participation in a zoom call on August 6, 20224 with the various vendors who had been hired to facilitate the live streaming of the two nights of concerts.  Thus, it is incomprehensible how Olivia Doty after the two nights of concerts seemed completely unaware that the whole and entire point of this production was a two-hour film and a live double music album.

*310.*   As a result, the Saturday night show was never recorded. There is no audio or visual video footage for the completion of Trident's Recording Products. This Saturday recording was absolutely critical to the purpose of the entire set of Shows. A record of the Saturday night show does not exist, and this was absolutely critical to the purpose of the entire set of Shows. A total of four full performances

were lost, the most important being that of the Dan Hicks Hot Licks band
performance which was just as critical to the entire evening's performance and
ultimately the film.

311.   The Greek Theater, as well as Defendant Sten and Snell, were aware
from the beginning of Trident's intent to film and record both nights for a full-
length feature documentary film to be released in 2025, in time for the Academy
Award screening season. The Greek Theater knew and understood that the
documentary and live album would be achieved by utilizing The Greek Theater's
in-house technical AV staff and materials and acknowledged this intention on the
Post-Concert Settlement Sheet labeled "Kingston Trio Concert Film" by billing
Trident for "Video Staffing and Equipment."

312.   On the following Tuesday, August 21, 2024, Trident received a bill
and detailed accounting for approximately $210,000. In the invoice all
aspects regarding production for filming and recording were reported as if all
contractual terms were fully performed by The Greek Theater was fully compliant,
except that they were not.

313.   Trident challenged the Greek's accounting statement in mid-August
2024.  For example,  no detailed professional accounting of the seats actually sold
vs converted to "comps" was ever submitted. What was submitted was an
approximation or a guess since there was no official seat count once the audience
was moved. Moreover, the Greek had no right either in writing or otherwise to
arbitrarily charge back on comp tickets.  To this day, the Greek Theater has failed
to justify or address its improper and inaccurate charges.

314.   On August 21, 2024, Trident discovered upon screening the
downloaded media on a 5TB hard drive obtained from Sweetwater that Saturdays
August 17, 2024 concert was not recorded. The Greek Theater charged Trident for
the filming and sound recording of the Saturday night Show. Trident received the
bill before they were provided with the hard drive. The Greek Theater had failed to

"put film in the camera," or in this case, hit the "record button" and drop the data imagery down into hard drives for routine protection.

315.   There wasn't even a backup protection track, the most basic element of all, produced either for the video or sound. This was unprofessional to the maximum degree and reflective of the dismissive attitude that The Greek Theater displayed towards Trident and the Kingston Trio.

316.   No effort was made to lay down Mikael Stewart's sounds transmissions stereo on a separate protective track or hard drive. If that capability did not exist on Sweetwater's AV board, Trident was never informed of that status. Trident was left to believe that at the very least a basic stereo track, to be later mixed, sweetened or added, would be available post-concert.

317.   During the Concerts and as part of the filming, The Greek Theater, in cooperation with Trident, made adjustments with the audience members to enhance the appearance of the crowd for the recording. Specifically, Trident in cooperation with The Greek Theater staff moved hundreds of audience members from their original seats to more expensive seats closer to the stage to create the impression of a fuller/larger crowd on camera.

318.   The written and oral agreements contained explicit provisions regarding the use of the jumbotron and e-blasts for promotional purposes but included no language about The Greek Theater's policy on upgraded seating, what they refer to as Complementary Seating ("Comps"). Despite the Contract's terms, Trident was later informed of additional charges in excess of $100,000 for the Comps that had been arranged by The Greek Theater. This information was not provided to Trident before or during the event planning process, or during the actual act of The Greek Theater staff moving audience members. Trident only became aware of this policy when The Greek Theater submitted their first "settlement" accounting of the Shows, which was long after the execution of the Agreement. Trident was never informed of the final or exact ticket sales.

**FIRST CLAIM FOR RELIEF**

BREACH OF WRITTEN CONTRACT AGAINST DEFENDANTS, SMG (ASM), MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN, THE CITY

319.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

320.   Plaintiff is  informed, believe, and thereon allege that Defendants breached the contract, labeled as the "Greek Theater User Agreement." See Exhibit 3 attached hereto.

321.   Breach of contract claims in the state of California require a valid and enforceable contract, plaintiff's performance or excuse for non-performance, defendant's breach, and the plaintiff's resulting damages. *eOnline Global v. Google, Inc.*, 387 F.Supp.3d 980, 985 (N.D. Cal. 2019).

322.   Plaintiff is  informed, believe, and thereon allege that Plaintiff and Defendants, The Greek Theater and SMG, entered a valid and enforceable contract January18, 2024 for the venue rental, performance, promotion, and filming for the Shows and Recording A LIVE DOUBLE ALBUM.

323.   There existed a written contracts between Plaintiff and Defendant the terms of which are set forth in Exhibit  3.  Additional terms were communicated via email and agreed upon between Trident and Defendant ASM/SMG (a/k/a Greek Theater management), acting as authorized agent for Defendant City of Los Angeles.

324.   Plaintiff has performed all terms, conditions and covenants required by it under the written contract described hereinabove.

325.   Defendants have failed to perform the various material covenants, terms and conditions required of them under the written contracts as set forth below. Thus, Defendants are in material breach of the written contracts between the parties.

TRIDENT  COMPLAINT

a.      Defendants agreed to charge Plaintiff $15,000 as a recording fee for both nights of the concert. Defendants have failed to enforce this provision by requesting $30,000 in total for both nights.

b.      Defendants also breached the contract by failing to ensure in synchronization the filming, including audio recordings and video footage, of the first concert. Defendants were informed of the requirement established in the agreed upon contract and failed to fulfill their responsibilities stated in the contract. Defendants failed to fulfil their responsibilities stated in the contract for this show. Defendants charged the Plaintiff with the full cost of the contract, as if executed properly despite failing to record major portion of 50% of the necessary footage required by Plaintiff.

c.      Defendants breached the contract by requiring Plaintiff to use an exclusive ticketing vendor, Ticketmaster, despite the lack of such requirement within the contract.

d.      Defendants also materially misrepresented provisions within the contract regarding advertising and in-house promotion. Defendants failed to fulfill their promise to promote the Shows through The Greek Theater's email subscriber list and on-site digital billboards.

326.   As a direct and proximate result of all the Defendants' breaches, Plaintiff is  seeking compensatory damages for an amount $15,000,000.00.

327.   As a result of Defendants' breach of term and conditions of the written agreement and invoices between Plaintiff and Defendants, Plaintiff has been damaged in at least the sum of $15,000,00.000.

### SECOND CLAIM FOR RELIEF

BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS, SMG (ASM), MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

328.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279 inclusive, as if fully set forth herein.

329.   Plaintiff is  informed, believe, and thereon allege Defendants failed to fulfill their implied covenant of good faith and fair dealing under California Law.

330.   All the Defendants have an implied obligation of good faith and fair dealing in every contract under California Law, meaning that an obligation is imposed by law on all the Defendants to act fairly and in good faith in discharging their contractual responsibilities. *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824 (N.D. Cal. 2024).

331.   Defendants failed to provide additional walkthroughs of the venue, any access to A/V equipment, advertising, and on-site promotion as specified between Plaintiff and Defendant. As a result of these failures, the Plaintiff contractual obligations were frustrated.

332.   Defendants have failed to perform their obligations under the contract. This failure to perform constitutes a breach of the covenant of good faith and fair dealing implied in the contract.

333.   As a direct and proximate result of all of the Defendants' conduct, the Plaintiff have been financially damaged and obligated to spend or incur liability for costs of suit, attorneys' fees, and related expenses to recover the benefits due to the Plaintiff under the contract, in an amount $15,000,000.

### THIRD CLAIM FOR RELIEF

FRAUD IN THE INDUCEMENT AGAINST DEFENDANTS STEN, SMG AND ASM

334.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

335.   Plaintiff is informed and believes, and based upon such information and belief alleges, that commencing on August 23, 2023 and continuing through the present, Defendants, and each of them, through B. Sparks, K. Sten, and P. Snell, in

their capacity as employees of The Greek Theater, falsely, fraudulently and intentionally made the representations telephonically and in writing set forth in Paragraphs 1 through 279 hereinabove.

336.  Actual fraud in California law occurs when a party to a contract, or someone acting in collusion with them, engages in deceptive conduct with the intent to mislead another party or persuade them to enter into the agreement. Cal. Civ. Code § 1572.

337.  The representations made by Defendants, and each of them, were in fact false, fraudulent and intentional. The true facts were that Defendants, and each of them, through B. Sparks, Defendant Sten and P. Snell knew, at the time they made the foregoing false and fraudulent representations that Defendants had no intention of honoring promotional services including 4-5 e-mail blasts on their Master Mailing List and placement on the billboard jumbotron, and regularly promoting the Trio as an upcoming attraction from March -August 2024 on the Greek Theater website, Instagram, and other social media.

338.  At the time these false and fraudulent representations were made, Defendants knew that they were false and made them with the intent to deceive Plaintiff, induce them into signing the Contract, and secure substantial financial commitments from them. Plaintiff, unaware of the fraudulent nature of these representations, reasonably relied upon them in executing the Contract and making significant financial investments.

339.  Plaintiff, at the time these false and fraudulent representations were intentionally made by Defendants, and each of them, and at the time Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations and believed them to be true. In justifiable reliance on these false and fraudulent representations, Plaintiff was induced into signing the Contract and making substantial financial commitments. Had Plaintiff known the actual facts it would never have signed the Contract.

340.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff has been damaged in an amount not less than $15,000,000.

341.   The aforementioned conduct of Defendants, and each of them, was intentional misrepresentation, deceit or concealment of a material fact known to the Defendants with the intention on the part of the Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious disregard of Plaintiff rights, so as to justify an award of punitive and exemplary damages, as well as an award of attorneys' fees to the extent allowed by law.

## FOURTH CLAIM FOR RELIEF

FRAUDULENT MISREPRESENTATION AGAINST DEFENDANTS ASM AND STEN

342.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

343.   Plaintiff is informed and believes, and based upon such information and belief alleges, that commencing on August 23, 2023 and continuing through the present, Defendants, ASM and Sten and each of them, through B. Sparks, and P. Snell, in their capacity as employees of The Greek Theater, falsely, fraudulently and intentionally made the representations telephonically and in writing set forth in Paragraphs 1 through 279 hereinabove.

344.   Actual fraud in California law occurs when a party to a contract, or someone acting in collusion with them, engages in deceptive conduct with the intent to mislead another party or persuade them to enter into the agreement. Cal. Civ. Code § 1572.

345.   The representations made by Defendants, and each of them, were in fact false, fraudulent and intentional. The true facts were that Defendants, and each of them, through ASM, B. Sparks, Sten, and P. Snell knew, at the time they made the foregoing false and fraudulent representations that Defendants had no intention

of honoring promotional services  including advertising through The Greek Theater mailing list of 420,000 email subscribers to take place each week and advertisement on the on-site calendar billboard jumbotron which border both the main stage and the street outside The Greek Theater.

346.   Defendants also falsely represented that Ticketmaster was the exclusive ticketing vendor, despite contractual terms stating otherwise, in an effort to further their scheme to sabotage Plaintiff' concert.

347.   At the time these false and fraudulent representations were made, Defendants knew that they had no intention of promoting Plaintiff' concert as promised. Instead, Defendants, in conspiracy with Live Nation and Ticketmaster, actively sought to undermine the concert's success by taking actions to ensure abnormally low attendance figures over the concert weekend.

348.   Plaintiff is further informed and believes, and based thereon allege, that Defendants never had any intention whatsoever of fulfilling their obligations under the Contract. Instead, Defendants always intended to divert funds and suppress the true financial performance of the concert to their own use and benefit, causing Plaintiff significant financial harm.

349.   When Defendants, and each of them, intentionally made these false and fraudulent representations they knew them to be false, and these false and fraudulent representations were made by Defendants, and each of them, with the intent to defraud and deceive Plaintiff, and with the intent to induce Plaintiff to act in the manner herein alleged.

350.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff has been damaged in an amount not less than $15,000,000.

351.   The aforementioned conduct of Defendants, and each of them, was intentional misrepresentation, deceit or concealment of a material fact known to the Defendants with the intention on the part of the Defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious

disregard of Plaintiff rights, so as to justify an award of punitive and exemplary damages, as well as an award of attorneys' fees to the extent allowed by law.

### FIFTH CLAIM FOR RELIEF

FRAUDULENT CONCEALEMENT AGAINST DEFENDANTS ASM AND STEN

352.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

353.   Plaintiff is informed and believes, and based upon such information and belief alleges, that commencing on August 23, 2023 and continuing through the present, Defendants ASM and Sten, and each of them, through B. Sparks and P. Snell, in their capacity as employees of The Greek Theater, falsely, fraudulently and intentionally made the representations telephonically and in writing set forth in Paragraphs 1 through 279 hereinabove.

354.   Actual fraud in California law occurs when a party to a contract, or someone acting in collusion with them, engages in deceptive conduct with the intent to mislead another party or persuade them to enter into the agreement. Cal. Civ. Code § 1572. Fraudulent concealment is actionable when a defendant has a duty to disclose material facts but fails to do so. This duty arises in four circumstances: (1) when the defendant has a fiduciary relationship with the plaintiff; (2) when the defendant possesses exclusive knowledge of material facts unknown to the plaintiff; (3) when the defendant actively conceals a material fact; or (4) when the defendant makes partial representations that are misleading due to the suppression of other material facts. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

355.   Defendants had a duty to disclose material information concerning the venue's management, promotional obligations, and ticketing arrangements, yet intentionally withheld and misrepresented these facts to induce Plaintiff into the Contract.

356.   Defendants intentionally withheld and misrepresented the fact that Plaintiff were required to use Ticketmaster as The Greek Theater's exclusive ticketing vendor, despite the lack of such requirement in the Contract.

357.   Defendants withheld information to Plaintiff that relocating the audience so that for filming, the Theater did not have blank spaces on camera, was going to increase the comp ticket charge in excess of $200,000

358.   Defendants failed to disclose the true financial performance of the Concert and billed Plaintiff $210,000. The invoice regarded all issues with filming and recording were reported as if all contractual terms were fully executed by The Greek Theater.

359.   In truth, The Greek Theater charged Plaintiff's for filming, but on the night of the Saturday Concert on August 17, 2024, no one hit the "record button," so there was no audio recordings or visual footage of the first concert.

360.   Defendants, in along with co-conspirator Olivia Doty, failed to disclose that Sweetwater operates and acts solely under directives of the SMG and The Greek Theater, meaning Defendants could grant Plaintiff access to the AV cage to promote successful execution of filming and recording the Concert.

361.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiff has been damaged in an amount not less than $15,000,000.

**SIXTH CLAIM FOR RELIEF**

VIOLATIONS OF THE RACKETEERINNG INFLUENCE AND CORRUPT ORGANIZATIONS ACT ("RICO") (WIRE FRAUD) 18 U.S.C. §§ 1961-1964 AGAINST DEFENDANTS MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN, GM STEN

362.   Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

363.   The relevant time period for Defendant Bass, Defendant Tran, Defendant Simril, Defendant Hutton, Defendant Lloyd, Defendant Sanchez, *and*

*Defendant Sten* stems from 2023 through the present, and possibly earlier, but at this point in discovery is as yet unknown and continues to the filing of this Complaint.

364.   Defendant Bass is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

365.   Defendant Simril is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

366.   Defendant Sanchez is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

367.   Defendant Lloyd is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

368.   Defendant Hutton is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

369.   Defendant Tran is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

370.   Defendant Sten is now and was at all times relevant to this action the RICO Person ("RICO Person") within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**THE RICO ENTERPRISE**

371.   The RICO Persons identified above have used The Greek Theater, owned by the City of Los Angeles and overseen by DRAP, an "associated-in-fact" enterprise within the meaning of 18 U.S.C. §§ 1961(4), to carry out the pattern of

racketeering activity. The enterprise consists of the RICO Persons, Defendant Bass, Defendant Tran, Defendant Simril, Defendant Hutton, Defendant Lloyd, and Defendant Sanchez, facilitated by Defendant Snell, all of whom have a part in operation or management of The Greek Theater.

372.  This enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and an ongoing relationship amongst the RICO Persons and The Greek Theater, with sufficient longevity to permit and enable pursuit of the enterprise's purpose and long-term objective through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

373.  This enterprise exists separate and apart from Defendant Bass's pattern of racketeering activity inasmuch as the RICO Persons and The Greek Theater have multiple goals, not all of which are fraudulent or illegal. The lawful activity engaged in by the enterprise includes functioning as a regular business operating as a live entertainment venue, generating revenue through ticket sales, concessions, and event rentals while managing artist bookings, venue maintenance, and marketing to sustain profitability.

374.  However, the Defendant RICO Persons and The Greek Theater have, since at least 2023 used this enterprise to conduct the related acts of wire fraud and management of the theater that has fostered an environment of such fraud and concealment comprising the pattern of racketeering, as well as the continuous acts set forth herein above.

*375.*  Defendant Bass is a "person" under the civil RICO statute because she knowingly and fraudulently tacitly approved of the conduct described herein, and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

*376.*  Defendant Simril is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the

conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

*377.* Defendant Sanchez is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

*378.* Defendant Lloyd is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

*379.* Defendant Hutton is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

*380.* Defendant Tran is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

*381.* Defendant Sten is a "person" under the civil RICO statute because she knowingly and fraudulently masterminded, conducted and participated in the conduct, the management and the operation of the enterprise's affairs, directly or indirectly, through a pattern of copyright infringement racketeering activity in violation of 18 U.S.C. § 1962(c).

TRIDENT  COMPLAINT

382.   As part of the wire fraud scheme, Defendants, with the assistance of Defendants ASM and Sten, in conjunction with other unindicted co-conspirators Olivia Doty, Natalie Combs, and Edward McGinty, engaged in a fraudulent scheme to misrepresent the extent of promotional efforts and unlawfully restrict Plaintiff's ability to sell concert tickets. Specifically, Defendants made false warranties and representations via email, including assurances that Plaintiff would receive extensive publicity through e-blast to The Greek Theater mailing list of 420,000 email subscribers to take place each week and advertisement on the on-site calendar billboard jumbotron which border both the main stage and the street outside The Greek Theater.

383.   Additionally, Defendants ASM and Sten falsely represented that Plaintiff were required to use Ticketmaster as the exclusive ticketing vendor, despite contractual terms stating that the venue had no such exclusivity and were not provided with alternative ticketing service options.

384.   At all relevant times, the Defendants and other unindicted co-conspirators associated with this enterprise conducted and participated, directly or indirectly, in the conduct of the enterprise affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(e).

385.   In furtherance of this racketeering pattern, since August 21, 2024, Defendants transmitted fraudulent accounting sheets and comp sheets containing illegal assumptions and miscalculations. Defendants, as part of their racketeering activity, sent Plaintiff a bill and detailed a fraudulent accounting sheet containing miscalculated and false financial figures, as well as comp sheets with misrepresented charges, including improper and excessive billing for Comp. tickets.

386.   The acts set forth above constitute a violation of wire fraud under 18 U.S.C. § 1343. Defendants and their accomplices and co-conspirators each committed and/or aided and abetted in the commission of two or more of these acts of racketeering activities.

387.   The Defendants and the other unindicted co-conspirators committed and caused to be committed a series of overt acts in the furtherance of the conspiracy and to effect the objects thereof, including but not limited to the acts set forth above.

388.   The acts of racketeering activity referred to in the previous paragraphs constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, common victims and a common result of fraud and enriching the Defendants and conspirators at Plaintiff expense while concealing the conspirators' fraudulent activities.

389.   18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

390.   As alleged in the preceding sections, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3).

391.   From at least August 23, 2023, and continuing to the present, Defendant Bass, in conjunction with unindicted co-conspirators Paul Snell, Brianna Sparks, Olivia Doty, Natalie Combs, and Edward McGinty including Live Nation and Ticketmaster, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit offenses of wire fraud, in violation of 18 U.S.C. § 1962(d).  It was a part and object of the conspiracy that Defendants and co-conspirators, knowingly devised and engaged in a fraudulent scheme involving wire communications to:

a.   Falsely represent that the Concert would receive significant promotional efforts, including e-blast mailing lists and placement on The Greek Theaters jumbotron, when in fact Defendants had no intention of providing such services.

b.   Falsely warrant that Plaintiff was required to use Ticketmaster as the exclusive ticketing vendor, despite contractual provisions stating otherwise, to limit Plaintiff's ability to control ticket sales and divert financial benefits to Defendants

and their co-conspirators.

  c. Disrupt the Concert by taking actions to suppress attendance, including discouraging ticket sales and interfering with promotional efforts, which led to abnormally low attendance and financial losses.

  d. Direct unindicted co-conspirators to disrupt the Concert Film, demonstrated by communications between Sweetwater and Plaintiff indicating Sweetwater takes its orders from The Greek Theater management and that Natalie Combs and Edward McGinty were never authorized or instructed to record the Saturday night Concert.

  392. Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity, specifically wire fraud.

  393. Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

  394. To date, Plaintiff has been damaged in excess of $15,000,000 plus prejudgment interest, attorneys' fees.

  395. Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three-fold their damages, plus costs and attorneys' fees from the Defendants.

## SEVENTH CLAIM FOR RELIEF

VIOLATION OF THE UNRUH CIVIL RIGHTS ACT (Cal. Civ. Code §51) AGAINST DEFENDANTS  MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

  396. Plaintiff realleges and incorporate herein by reference Paragraphs 1 through 279, inclusive, as if fully set forth herein.

397.   Plaintiff is informed, believe, and thereon allege Defendants failure to make additional ticketing options available to the public is a violation of the Unruh Civil Rights Act by intentionally discriminating against the elderly.

398.   California Civil Code Section 50, known as the Unruh Civil Rights Act, provides that: "[All persons] … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

399.   Discriminatory intent under the Unruh Civil Rights Act can be established where the plaintiff shows that the defendant was aware of the characteristic or group that was allegedly discriminated against. *Duronslet v. Cnty. of Los Angeles*, 266 F. Supp. 3d 1213, 1217 (C.D. Cal. 2017).

400.   Plaintiff made Defendant aware of the Plaintiff's older fan base and Defendant understood that most ticket sales would come from the elderly. Defendant's policies, outlined below, resulted in unequal treatment by the Defendant.

a.   Defendants failed to provide full and equal access to its public business establishment by falsely requiring potential concertgoers to purchase and utilize the Ticketmaster smartphone app.

b.   Defendants falsely indicated that ticket sales were only available through the smartphone app and no physical tickets were available for purchase at the box office or over the phone. Defendants, later, expressed that physical tickets were available over phone and at the box office.

401.   Defendants' failure to avail the elderly to alternative ticketing options, such as box office sales, or over-the-phone sales, resulted in low ticket sales.

402.   As a direct and proximate result of the Defendant's actions, the elderly have been disproportionally discriminated against.

403.   As a result of the Defendant's practices and policies, Plaintiff has been damaged in at least the sum of $15,000,000.

# EIGHTH CLAIM FOR RELIEF

UNLAWFUL EXCLUSIVE DEALING IN VIOLATION OF SHERMAN ACT § 1 (15 U.S.C. § 4) AGAINST DEFENDANTS TICKETMASTER, LIVE NATION, ASM GLOBAL, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

404.    Plaintiff incorporate the allegations of Paragraphs 1 through 279 above.

405.    Defendants Live Nation and Ticketmaster (the" Live Nation-Ticketmaster Defendants") have conspired with Defendants ASM Global, Mayor Bass, Commissioner Simril, Commissioner Sanchez, Commissioner Lloyd, Commissioner Hutton and Commissioner Tran and the City of Los Angeles (the "Los Angeles Defendants") and thereby engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act by agreeing to give Ticketmaster and Live Nation preferential treatment in the primary ticketing market and promotional services.

406.    The provision of primary ticketing services within the United States is a relevant antitrust market.

407.    Live Nation, and its wholly owned subsidiary Ticketmaster, and the Los Angeles Defendants entered into an exclusive agreement to utilize Ticketmaster as the sole ticketing vendor for events held at The Greek Theater (the "Illegal Undisclosed Agreement"). This Illegal Undisclosed Agreement unreasonably restrains trade in violation of § 1 of the Sherman Act.

408.    Additionally, the Illegal Undisclosed Agreement gives preferential treatment to Live Nation for promotion services as the promoter or booking agent for "regular programming" at The Greek Theater.

409.    The Los Angeles Defendants have allowed the Live Nation-Ticketmaster Defendants to conduct this Illegal Undisclosed Agreement such that Live Nation-Ticketmaster Defendants have received preferential treatment, thus

forcing out other competitors in ticketing and promotional services at The Greek Theater.

410.   Live Nation and Ticketmaster, through this Illegal Undisclosed Agreement, have dominated the primary ticketing service market at The Greek Theater and thereby illegally restricted trade in direct violation of the Open Venue protocols which govern The Greek Theater Management Agreement .

411.   The Illegal Undisclosed Agreement with its unlawful and exclusive dealings created a harmful effect on the Plaintiff and their fans. Plaintiff was not afforded promotional benefits because of the control Ticketmaster retained over The Greek Theater. Furthermore, the Defendants frustrated ticket sales through its unreasonable ticketing procedure.

412.   Live Nation's anticompetitive and exclusionary practices violate Section 1 of the Sherman Act, 15 U.S.C. § 1 and have caused damages to Trident of at least $15,000,000.

### NINTH CLAIM FOR RELIEF

MONOPOLIZATION OF PRIMARY TICKETING SERVICES IN THE LOS ANGELES AREA IN VIOLATION OF SHERMAN ACT § 2 (15 U.S.C. § 1.4) AGAINST TICKETMASTER, LIVE NATION, ASM GLOBAL, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

413.   Plaintiff incorporates the allegations of Paragraphs 1 through 279 above.

414.   Live Nation and Ticketmaster have monopolized the primary ticketing services markets within the United States, and in particular at The Greek Theater, owned by the City of Los Angeles. Live Nation ensures its monopoly by engaging concert venues, amphitheaters, and other venues in offering its ticketing services as the main source of ticketing. The primary ticketing services in the Los Angeles area is a relevant antitrust market.

415.   Live Nation has unlawfully maintained a monopoly in primary ticketing services by excluding other competitors through vertical agreements, including:

a.   Threatening to withhold shows from venues who refuse to utilize Live Nations ticketing services;

b.   Entering into agreements with entities, like the City of Los Angeles, that disallow competing ticketing services from conducting business at The Greek Theater;

c.   Retaliating against venues that contract with rival ticketers by:

i.   Diverting concerts on Live Nation-promoted tours to other venues;

ii.   disabling or delaying the sale of secondary tickets through the rival ticketer's platform;

iii.   Refusing to publicize shows hosted by a venue that uses a competing ticketer;

d.   Diverting content away from venues ticketed by companies other than Ticketmaster, making it risky for any venue to contract with a rival ticketer; and

e.   Lodging complaints against rival ticketers when Live Nation promotes a show at a venue where Ticketmaster is not the primary ticketer;

f.   Foreclosing rival ticketing companies from the market by:

g.   Imposing long-term exclusive contracts covering a significant proportion of tickets sold;

h.   Engaging in strategic purchases of rival promoters and venues to enhance its market power in content and to convert ticketing to Ticketmaster, further foreclosing the primary ticketing market; and

i.   Deterring entry and expansion by rivals into primary ticketing by using its monopoly to expand its control over secondary ticketing, which previously had been an entry point for primary ticketing.

416.   Although each of these acts is anticompetitive when considered alongside Live Nation's associated conduct, each act occurs in concert with and

TRIDENT  COMPLAINT

against the backdrop of allegations and facts outlined throughout this Complaint. These acts have synergistic anticompetitive effects that have harmed competition and the competitive process.

417.   Live Nation has retained a monopoly over the primary ticketing service market in the United States through strong-arming major venues into using their services and engaging those venues in contracts with restrictive terms.

418.   Live Nation has precluded any substantial competition in primary ticketing services at major concert venues in the United States.

419.   These anti-competitive actions by Live Nation have resulted in harmful effects on the ticketing market, artists seeking to host live events, and fans of such artists.

420.   Live Nation's exclusionary conduct lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation's anticompetitive and unlawful conduct.

421.   Live Nation's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

## TENTH CLAIM FOR RELIEF

UNLAWFUL EXCLUSIVE DEALING IN VIOLATION OF SHERMAN ACT § 1 (15 U.S.C. § 1.4) AGAINST TICKETMASTER, LIVE NATION, ASM GLOBAL, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

422.   Plaintiff incorporate the allegations of Paragraphs 1 through 279 above.

423.   The provision of primary ticketing services to major concert venues in the United States is a relevant antitrust market, and the provision of primary concert ticketing services to major concert venues in the United States is a relevant antitrust market.

424.    Ticketmaster's long-term exclusive agreements to provide primary ticketing services to major concert venues in the United States unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and in particular, Ticketmaster's Illegal Undisclosed Agreement whereby the Los Angeles Defendants quietly allow Ticketmaster to be the exclusive ticketing service, thereby violating the Open Venue Protocols mandated by the 2019 Management Agreement.

425.    Thus, Ticketmaster merely piggy-backs on the Management Agreement between Defendant ASM and the City of Los Angeles, whereby Ticketmaster has an implicit Illegal Undisclosed Agreement for ticketing and essentially has displaced Defendant ASM from truly managing The Greek Theater as called for by the2019 Management Agreement.

426.    By this piggy-back arrangement, Ticketmaster silently operates a long-term exclusive primary ticketing contract that restrict the access of Ticketmaster's competitors to the only significant channel of distribution for primary ticketing services to major concert venues such as The Greek Theater.

427.    Through the Illegal Undisclosed Agreement, Ticketmaster has foreclosed a substantial share of the market for the provision of primary ticketing services to The Greek Theater.

428.    Live Nation's anticompetitive acts have had harmful effects on fans of independently produced and promoted concerts, The Greek Theater as the hosting venue, and fair and transparent competition for primary ticketing.

429.    The Los Angeles Defendants have conspired with or have been complicit in allowing and enabling these anticompetitive acts to take place for years, with a "business as usual" attitude in direct violation of the City's written Open Venue Protocols under which Defendant ASM receiving its 2018 Management Agreement for The Greek Theater.

430.    The exclusionary conduct of Live Nation-Ticketmaster lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation-

TRIDENT  COMPLAINT

Ticketmaster's anticompetitive and unlawful conduct. Therefore, Plaintiff Trident has been damaged in excess of $15,000,000.

## ELEVENTH CLAIM FOR RELIEF

MONOPOLIZATION OF MARKETS FOR CONCERT PROMOTION SERVICES IN VIOLATION OF SHERMAN ACT § 2 (15 U.S.C. § 1.4) AGAINST TICKETMASTER, LIVE NATION, CLA, DRP, ASM GLOBAL, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN

431.   Plaintiff incorporate the allegations of Paragraphs 1 through 279 above.

432.   Live Nation and Ticketmaster have monopolized the markets for concert promotion services within the United States, and in particular the market for concerts at The Greek Theater.  Live Nation ensures its monopoly by entering exclusionary contracts with major concert venues, amphitheaters, and major theater venues to engage in their concert promotion service, such as The Greek Theater. Markets for concert promotion services, especially for venues such as The Greek Theater, is a relevant antitrust market within the United States.

433.   Live Nation has unlawfully maintained a monopoly in concert promotion services by excluding other competitors through vertical agreements, including:

a.     Engaging in strategic purchases of rival promoters (actual or potential) and venues to enhance and entrench its monopoly power;

b.     Deterring entry and expansion by rivals by threatening potential rivals and their investors; and

c.     Imposing restrictive terms in contracts with major concert venues that undermine and foreclose competition from actual and potential rival promoters. In particular, through its subsidiary, Ticketmaster, Live Nation has discouraged, if not

made it impossible for smaller independent promoters to produce acts at The Greek Theater that are not part of the Illegal Undisclosed Agreement.

d.     The Los Angeles Defendants have conspired with or have been complicit in allowing and enabling these anticompetitive acts to take place for years, with a "business as usual" attitude in direct violation of the City's written Open Venue Protocols under which Defendant ASM receiving its 2019 Management Agreement for The Greek Theater.

434.   Although each of these acts is anticompetitive when considered alongside Live Nation's associated conduct, each act occurs in concert with and against the backdrop of allegations and facts outlined throughout this Complaint. These acts have synergistic anticompetitive effects that have harmed competition and the competitive process.

435.   Live Nation's conduct restricts the entry of other competitors in concert promotion markets, especially as it applies to The Greek Theater where Plaintiff sought to produce two concerts in August of 2024.

436.   Live Nation engaged in exclusionary conduct which resulted in harmful effects to the Plaintiff and competitors. In response to and in compliance with the Illegal Undisclosed Agreement, Defendant ASM, withheld promotional services from the Plaintiff which undermined the Plaintiff's success.

437.   The Los Angeles Defendants have conspired with or have been complicit in allowing and enabling these anticompetitive acts to take place for years, with a "business as usual" attitude in direct violation of the City's written Open Venue Protocols under which Defendant ASM receiving its 2019 Management Agreement for The Greek Theater.

438.   By conspiring, aiding and abetting Live Nation-Ticketmaster's Illegal Undisclosed Agreement, the Los Angeles Defendants have conspired with or have been complicit in allowing and enabling these anticompetitive acts to take place for years, with a "business as usual" attitude in direct violation of the City's written Open Venue Protocols under which Defendant ASM receiving its 2018

Management Agreement for The Greek Theater, and such practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

439.   The exclusionary conduct of Live Nation-Ticketmaster lacks a non-pretextual procompetitive justification that offsets the harm caused by Live Nation-Ticketmaster's anticompetitive and unlawful conduct. Therefore, Plaintiff Trident has been damaged in excess of $15,000,000.

## PRAYER

WHEREFORE, Plaintiff prays for relief as follows:

**FOR THE FIRST CLAIM FOR RELIEF FOR BREACH OF WRITTEN CONTRACT AGAINST DEFENDANTS SMG (ASM), MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN, CLA:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE SECOND CLAIM FOR RELIEF FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEFENDANTS, SMG (ASM), MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE THIRD CLAIM FOR FRAUD IN THE INDUCEMENT AGAINST DEFENDANTS STEN, SMG AND ASM:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE FOURTH CLAIM FOR RELIEF FOR FRAUDULENT MISREPRESENTATION AGAINST DEFENDANTS ASM AND STEN:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE FIFTH CLAIM FOR RELIEF FOR FRAUDULENT CONCEALEMENT AGAINST DEFENDANTS ASM AND STEN:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE SIXTH CLAIM FOR VIOLATIONS OF THE RACKETEERINNG INFLUENCE AND CORRUPT ORGANIZATIONS ACT ("RICO") (WIRE FRAUD) AGAINST DEFENDANTS COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.      For Attorney's Fees to be proved at trial;

3.      For Interest to be proved at trial; and

4.      For other relief that the court may grant;

**FOR THE SEVENTH CLAIM FOR VIOLATION OF THE UNRUH CIVIL RIGHTS ACT (Cal. Civ. §51) AGAINST DEFENDANTS, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN**

1.      For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.      For Attorney's Fees to be proved at trial;

3.      For Interest to be proved at trial; and

4.      For other relief that the court may grant;

**FOR THE EIGHTH CLAIM FOR RELIEF FOR UNLAWFUL EXCLUSIVE DEALING IN VIOLATION OF SHERMAN ACT § 1 AGAINST DEFENDANTS TICKETMASTER, LIVE NATION, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ, COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN:**

1.      For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.      For Attorney's Fees to be proved at trial;

3.      For Interest to be proved at trial; and

4.      For other relief that the court may grant;

**FOR THE NINTH CLAIM FOR RELIEF FOR MONOPOLIZATION OF PRIMARY TICKETING SERVICES MARKETS IN VIOLATION OF SHERMAN ACT § 2 AGAINST TICKETMASTER, LIVE NATION, MAYOR BASS, COMMISSIONER SIMRIL, COMMISSIONER SANCHEZ,**

**COMMISSIONER LLOYD, COMMISSIONER HUTTON, COMMISSIONER TRAN:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR THE TENTH CLAIM FOR MONOPOLIZATION OF MARKETS FOR CONCERT PROMOTION SERVICES IN VIOLATION OF SHERMAN ACT § 2. AGAINST TICKETMASTER, LIVE NATION, CLA, DRP:**

1.     For damages in at least the sum of Fifteen Million Dollars ($15,000,000) including late fees or an amount to be proved at trial;

2.     For Attorney's Fees to be proved at trial;

3.     For Interest to be proved at trial; and

4.     For other relief that the court may grant;

**FOR ALL CLAIMS FOR RELIEF:**

1.     For costs of suit incurred herein; and

2.     For any such other and further relief as this Honorable Court deems just and proper.


DATED:  September 22, 2025    TROPE AND TROPE LAW GROUP


_____

KONRAD L. TROPE,

ATTORNEYS FOR PLAINTIFF

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable by a jury in the above-entitled action.

DATED:  September 22, 2025

TROPE AND TROPE LAW GROUP

_____

KONRAD L. TROPE,

ATTORNEYS FOR PLAINTIFF

TRIDENT  COMPLAINT